In re Jeanine P. FOX, Debtor.

Jeanine P. FOX, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Defendant.

In re James J. HAMMON and Elaine D. Hammon, Debtors.

James J. HAMMON and Elaine D. Hammon, Plaintiffs,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Defendant.

Bankruptcy Nos. 5–91–01745, 5–92–00949. Adv. Nos. 5–92–0011, 5–92–0087.

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

Aug. 18, 1993.

Gregory T. Moro, Bloomsburg, PA, for Jeanine P. Fox.

K. Kevin Murphy, Harrisburg, PA, for Pa. Higher Educ. Assistance Agency.

George Clark, Scranton, PA, for James J. and Elaine D. Hammon.

### OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

At issue before the Court in the above-captioned matters are the dischargeability of student loans specifically by reason of undue hardship.

The parties have agreed that the applicable subsection is 11 U.S.C. § 523(a)(8)(B) which reads as follows:

(a) A discharge under section 727, 1141, [,] 1228[a] 1228(b), or 1328(b) of this title [11 USCS § 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

## BURDEN OF PROOF

*In re Fitzgerald*, 40 B.R. 528 (Bkrtcy. E.D.Pa.1984) concluded that "... § 523(a)(8), in conjunction with the legislative history, leads to the conclusion that the debtor bears the burden of proof in asserting that undue hardship is present under § 523(a)(8)(B). *In re Fitzgerald* at p. 529.

In light of the Supreme Court pronouncements in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), this conclusion may not be entirely accurate.

At the outset, we distinguish between the standard of proof that a creditor must satisfy in order to establish a valid claim against a bankrupt estate and the standard that a creditor who has established a valid claim *must still satisfy* in order to avoid dischargeability. The validity of a creditor's claim is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code. [Emphasis ours.] *Id.* at p. 282, 111 S.Ct. at p. 657.

The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts— such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud. Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests.

Our conviction that Congress intended the preponderance standard to apply to the discharge exceptions is reinforced by the structure of § 523(a), (footnote omitted) which groups together in the same subsection a variety of exceptions without any indication that any particular exception is subject to a special standard of proof. The omission of any suggestion that different exemptions have different burdens of proof implies that the legislators intended the same standard to govern the nondischargeability under § 523(a)(2) of fraud claims and, for example, the nondischargeability under § 523(a)(5) of claims for child support and alimony. Because it seems clear that a preponderance of the evidence is sufficient to establish the nondischargeability of some of the types of claims covered by § 523(a),[14] it is fair to infer that Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions. *Id.* at p. 286, 287–88, 111 S.Ct. at p. 659, 660.

---

[14] For example, § 523(a) provides for the nondischargeability of debts not only for child support and alimony, but also for certain fines and penalties, educational loans, and tax obligations. See 11 U.S.C. § 523(a)(1); § 523(a)(5); § 523(a)(7); § 523(a)(8).

Nevertheless, the Advisory Committee note in Federal Rule of Bankruptcy Procedure 4005, although dealing with § 727 discharge objections, appears to reflect relevant considerations when dealing with § 523 dischargeability issues.

This rule does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector.

 Despite the best efforts of the Courts to lend objectivity to the term "undue hardship", hardship remains a subjective characteristic personal to the individual debtor. One man's meat is indeed another man's poison. A five mile jog to work because one doesn't have a car may be invigorating to some and a curse to others. The *Report of*

*the Commission on the Bankruptcy Laws of the United States* recognized the importance of tailoring the concept of "undue hardship" to individual debtors when they indicated that "the total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living *within their management capability,* as well as to pay the education debt." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. no. 137, 93rd Cong., 1st Sess., Pt. II, 140, 141 (Appendix 2) (1973) reprinted, Collier on Bankruptcy, Appendix 2, L. King, (15th ed.).

■ Accordingly, in the opinion of this Court, proving the nonexistence of undue hardship is a burden which would unfairly be placed on the creditor, absent a prima facie showing of such hardship by the debtor. We, therefore, hold that it is the burden of the debtor to go forward with evidence of "undue hardship". Just as in *Meridian Bank v. Allen,* 958 F.2d 1226 (3rd Cir.1992), the Debtor must establish those legally sufficient facts by more than "mere generalities". Having done that, the ultimate burden of proving that this type of hardship is not present is the creditor's.

## UNDUE HARDSHIP

It's troubling that Congress did not see fit to define the term "undue hardship" in drafting the Bankruptcy Code. They have thus left it up to the various Bankruptcy Courts to utilize their discretion in defining what that term means after an analysis of the statute and a review of applicable legislative history.

An examination of the statute will clearly indicate that Congress felt the need to examine into "undue hardship" only if the loan had been due for a period less than seven (7) years. 11 U.S.C. § 523(a)(8)(A). At the time the Code was initially drafted in 1978, Congress felt that a loan that was due for five (5) years should be discharged without an evaluation of the hardships involved.

Moreover, the 1978 Code, as originally drafted, provided that discharge of a student loan, no matter what its age, would be automatic if the Debtor directed three (3) to five

(5) years of his or her disposable income toward the payment of *all* unsecured creditors including student loans. This was the thrust of Section 1328 of the Bankruptcy Code and the super discharge provided by Chapter 13. Of course, since it was originally drafted, Section 1328 has been changed to eliminate the automatic discharge of student loans. See 11 U.S.C. § 1328(a)(2).

These amendments to the Code are not referred to in order to question the wisdom of Congress in making these changes but merely to identify the parameters under which the term "undue hardship" was initially used. If a Debtor directed his or her disposable income to the creditors for a period of three (3) to five (5) years, hardship was not an issue. If the student loan was due for a period in excess of five (5) years, hardship was not an issue. This Court knows of no greater proof of legislative intent than the words of the statute itself.

A review of the Bankruptcy Code also indicates that Congress did not choose to prefer the student loan when identifying the unsecured creditors who should receive a priority over other unsecured creditors as they did with farmers, fishermen and employees (See 11 U.S.C. § 507).

The Third Circuit has recently addressed student loans in the case of *In re Pelkowski,* 990 F.2d 737 (1993).

■ It is the "well accepted" rule that "... exceptions to discharge, which reflect a Congressional determination that other public policies outweigh the debtor's need for a fresh start, should be narrowly construed against the creditor and in favor of the debtor." *Id.* at p. 744. Nevertheless, the Court should construe a provision no more narrowly than the language and legislative history allow. *Id.* at p. 744.

We also know from *In re Pelkowski* that "in the absence of clearly expressed contrary legislative intent, the statutory language must be regarded as conclusive." *Id.* at p. 741. A statute's silence should be no reason to create an ambiguity. *Id.* at p. 741.

In order to interpret legislative intent, the Third Circuit reviewed legislative history and agreed with the Sixth Circuit in concluding

that "Congress enacted 11 U.S.C. § 523(a)(8) in an effort to prevent abuses in and protect the solvency of the educational loan program." *Id.* at p. 742 citing *In re Merchant,* 958 F.2d 738, 742 (6th Cir.1992).

In considering the meaning of the term "undue hardship", the Courts have struggled to lend objectivity to this term of art, presumably to reduce the subjectivity implicit in an analysis done state by state; judge by judge; or even debtor by debtor. This subjectivity was recognized by the Court in *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979) in Judge Twardowski's criticism of those Courts that have tried to define the term "undue hardship" by using some sort of "definitional approach". "These attempts at dictionary analysis have resulted in much confusion, a lack of definite standards, and a marked inconsistency in the severity of conditions required by different Courts for establishing a case of 'undue hardship'". *Id.* at p. 536.

The *Johnson* Court then went on to author a three-tiered examination. The first tier would involve an analysis of three (3) tests. First would be the mechanical test, which is the response to the question whether the Debtor's future financial resources for the longest foreseeable period of time allowed for repayment is sufficient to support the Debtor and his dependent at a subsistence or poverty standard of living as well as to fund repayment of the student loan. If the Debtor can afford that payment, then discharge of the student loan must be denied.

The second part of that test is the good faith test so that if the Debtor passes the mechanical test and cannot afford to pay back the student loan, then the Court asks whether the Debtor's negligence or irresponsibility was responsible for his or her inability to be able to pay the student loan under the mechanical test.

If the Debtor passes the mechanical test and was not negligent or irresponsible in creating that situation, then the debt should be discharged according to *In re Johnson.* If, however, the Debtor's negligence or irresponsibility was responsible for his or her inability to pay back the student loan, then the presumption against discharge is established and can only be rebutted by the Debtor passing the third and final test, which is whether the dominant purpose of the bankruptcy petition was the discharge of the student loan debt or whether the Debtor has definitely benefitted financially from the education which the loan helped to finance. If the Debtor's dominant purpose in filing the bankruptcy was the discharge of the student loan debt or if the Debtor has definitely benefitted financially from the education which the loan financed, then the *Johnson* Court would deny ·discharge.

█ As Judge Scholl did in *In re Bryant,* 72 B.R. 913 (Bankr.E.D.Pa.1987), this Court agrees that the *Johnson* test pointed out many factors which should be considered in the ultimate adjudication. But, like Judge Scholl, whether the purpose of the bankruptcy is to discharge the student loan should be irrelevant. We further agree with Judge Scholl in concluding that whether the Debtor has benefitted financially from his education which the loan has helped finance is also irrelevant except as an element in determining his income and his income potential. *In re Bryant, Id.* at p. 919.

█ In *Bryant,* Judge Scholl argued that "excepting student loans from discharge, on the basis of income at or beneath the poverty line, in the absence of 'unique' or 'extraordinary' circumstances, is too harsh a test for debtors. However, we do not believe that the definition of 'undue hardship' so as to allow the discharge of student loan obligations in Chapter Seven cases should be interpreted liberally, given that debtors may obtain the complete discharge of student loan obligations by filing a Chapter Thirteen petition instead of a Chapter Seven petition." *In re Bryant, Id.* at p. 917. In 1990, Congress amended the discharge provisions of Chapter Thirteen by excepting debts arising under Section 523(a)(8) from discharge under a Chapter Thirteen plan. Therefore, the reason for Judge Scholl's reluctance to interpret the Chapter Seven student loan discharge liberally has been removed by Congress in 1990. This Court sees no impediment or reason to deviate from the previous stated principle that exceptions to discharge should

be narrowly construed against the creditor and in favor of the debtor.

█ The mechanical test proposed by Judge Twardowski in *In re Johnson* requires the Debtor to live below the subsistence or poverty standard of living in order to establish dischargeability by suggesting that the Debtor's ability to pay the student loan and live at that standard is equivalent to possessing the adequate financial resources so as not to constitute "undue hardship". This Court will not "sentence" an individual to a decade of poverty while paying lip service to the concept of fresh start. If Congress wanted all student loans non-dischargeable, they should have verbalized it in the statute. Congress did say that if it was an undue hardship, the student loan should be discharged. This Court finds that living at subsistence level would normally be an undue hardship requiring a discharge of any attendant student loan.

█ The 1973 *Report of the Commission on the Bankruptcy Laws of the United States* provided the following test:

> In order to determine whether non-dischargeability of the debt will impose an 'undue hardship' on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. no. 137, 93rd Cong., 1st Sess., Pt. II, 140, 141 (Appendix 2) (1973) reprinted, Collier on Bankruptcy, Appendix 2, L. King, (15th ed.).

It is the holding of this Court that that test is consistent with the Third Circuit pronouncements in *In re Pelkowski.* This is purely and simply a mechanical test based on the Debtor's future financial resources allowing for a "minimal standard of living". We will interpret that standard so as to allow the Debtor the economic wherewithal to lend reality to the concept of "fresh start".

█ *In re Pelkowski* recognized that the focus of the prohibition against student loan discharges rested on the "twin goals of rescuing the student loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving debtors". *In re Pelkowski, supra* at p. 742. To the extent that the Debtor's resources, including his or her future income potential is sufficient to afford repayment of the student loan, discharge will be denied. To the extent that the student loan program benefits from the non-dischargeability with regard to this type of Debtor, we have addressed each of the goals that concern Congress.

█ This Court hereby adopts the reasoning of *In re Courtney,* 79 B.R. 1004 (Bkrtcy.N.D.Ind.1987) which held that where the debtor has the present financial wherewithal as well as future ability and prospects to liquidate a student loan without undue hardship, a discharge will be denied. This was the specific concern of our District Court in the recent case of *In re Trisha L. Criswell,* case number 1–91–01103, adversary number 1–91–0132, (M.D.Pa. December 21, 1992) wherein the District Court concluded that an examination of the Debtor's future ability to pay her debt was imperative since it is mandated by the statute. We agree. If the Debtor has the future ability to pay a student loan without jeopardizing the ability to rebuild his or her life, then that debt should not be discharged.

### DISCUSSION

█ The Debtor, Jeanine P. Fox, is a fifty-three (53) year old female who received several student loans beginning in about 1970. These student loans were utilized to finance the Debtor's entire education including undergraduate and postgraduate work. The 1971 student loan has been stipulated to be dischargeable and the contest is limited to a loan obtained in 1981. *Transcript,* p. 7.

When the loan was obtained in 1981, the repayments were consolidated with the earlier loan.

The Debtor's income in 1983 was zero ($0.00); in 1984, it was Four Thousand Five Hundred Twenty–Four Dollars ($4,524.00);

and in 1985, it was Three Thousand Two Hundred Ninety–Four Dollars ($3,294.00).

From 1985 to 1988, Ms. Fox was employed by the Intermediate Unit in a part-time position in preschool, Head Start, and adult literacy. While doing this, the Debtor also worked four (4) other part-time positions as a waitress, in private child care, as a sales demonstrator and various odd jobs.

In 1986, the Debtor's income was Four Thousand Sixty–Six Dollars ($4,066.00) and in 1987, it was Five Thousand Four Hundred Seventy–One Dollars ($5,471.00).

In 1988, the Debtor obtained a new position which was full time for a foster care agency while working two other jobs as a waitress and as a housekeeper.

Her 1988 starting salary was Seventeen Thousand Four Hundred Dollars ($17,400.00) and the job lasted until 1989 when she was laid off while earning approximately Twenty–Two Thousand Dollars ($22,000.00).

The Debtor was unemployed until 1990 when she secured a position in the Snyder County Children and Youth Services as a caseworker.

In 1990, her total income was Nine Thousand Three Hundred Fifty–Nine Dollars ($9,359.00) including unemployment compensation.

The Debtor's current net income is Twelve Thousand Forty–Nine and 70/100 Dollars ($12,049.70).

1990 was a devastating year for the Debtor since her expenditures averaged about Twelve Hundred Dollars ($1,200.00) a month and her income was obviously much lower.

The Debtor testified that she was not eligible for any overtime compensation and that her gross salary at her current employment was Sixteen Thousand Dollars to Sixteen Thousand Five Hundred Dollars ($16,000.00–$16,500.00).

The Debtor's 1991 income tax return was identified and indicated a gross income of Eighteen Thousand Two Hundred Thirty–Five and 39/100 Dollars ($18,235.39).

The Debtor owns no real estate and maintains a checking account with only a nominal amount on deposit.

The Debtor further testified that the contents of her home are borrowed or purchased at yard sales as is her clothing. *Transcript,* p. 27.

The Debtor owns a 1984 Buick with over One Hundred Fifty Thousand miles (150,000) on it. She owns no other assets.

The Debtor's monthly expenses were listed and admitted into evidence.

The Debtor testified that after mandatory expenses she is left with Ninety–Two Dollars ($92.00) a month to pay for any emergencies that might arise such as vehicle repairs and/or medical bills. *Transcript,* p. 51.

The Defendant, Pennsylvania Higher Education Assistance Agency, ("PHEAA"), brought forth a witness who testified that the current balance outstanding on the 1981 Five Thousand Dollar ($5,000.00) loan is Two Thousand Six Hundred Forty–Four and 09/100 Dollars ($2,644.09). They also testified that they would be willing to work with the Debtor so that the balance could be paid back gradually at a minimum amount of Twenty Dollars ($20.00) per month.

The parties have basically agreed that this student loan is generally non-dischargeable unless it fits within the exception of "undue hardship".

Since we have found that it is the burden of the Debtor to go forward with evidence of undue hardship, we are required to determine whether this Debtor's current or future resources are sufficient to pay the student loan and still allow her a minimal living standard.

In answering this question, we find that the Debtor is a hard working individual living a frugal lifestyle not from choice but because of necessity. The testimony of the Debtor was found by this Court to be sincere. Her efforts to maintain the living standard which she has found herself in should be applauded. She was well aware of the vicissitudes of an aging car and could have used a cushion of much larger than Ninety–Two Dollars

($92.00) per month to prepare for the inevitable demise of such vehicle.

Even at a modest interest rate, the interest alone on the student indebtedness would barely be paid by the proposal of PHEAA of Twenty Dollars ($20.00) per month.

This woman is fifty-three (53) years old and in ten (10) years, the normal time period with which we will look at a repayment of the student loan, she will be approaching retirement. If all the Debtor could afford during that ten (10) year period are interest payments and a small amount in an attempt to salvage sufficient funds to protect her in the event of various emergencies, then we would not blame this Debtor for losing all hope in what appears to be a desperate situation.

We therefore conclude that the type of hardship that this Debtor would encounter if she were to be required to pay the student loan exceeds that hardship normally associated with the payment of an indebtedness.

The Debtor's hardship is truly "undue" and is therefore dischargeable.

 The Hammon matter involves the student loans of both male and female Debtors.

The indebtedness owing to PHEAA by Mrs. Hammon is in the neighborhood of Sixteen Thousand Dollars ($16,000.00) and approximately Three Thousand Dollars ($3,000.00) relative to Mr. Hammon.

Mr. Hammon testified that he is currently an insurance agent marketing all lines of insurance on a commission basis, wherein he is paid with a draw against those commissions. Mr. Hammon testified that his weekly income was approximately Five Hundred Dollars ($500.00). *Transcript*, p. 12. Nevertheless, at the time that he obtained the loan, his income was in excess of Forty–Five Thousand Dollars ($45,000.00) together with about Five Thousand Dollars ($5,000.00) in extra commissions and earnings. *Transcript*, p. 13. He currently owns a home which may or may not be able to be retained because of the pending bankruptcy. The house is in significant disrepair. *Transcript*, p. 13.

A tax indebtedness to the Internal Revenue Service remains from 1989 and a tax obligation is expected for 1991 and 1992. *Transcript*, p. 14.

The Debtor testified that his reduction in income was a result of the fact that "it was an intolerable situation" and "[I] chose to leave".

Mr. Hammon further testified that he had been an insurance salesman from 1969. He was originally an agent with Metropolitan Life Insurance Company earning as much as Twenty–Seven Thousand Dollars ($27,-000.00). In 1985, he left that employment to work for Prudential Life Insurance Company. *Transcript*, p. 17.

The Debtor testified that his total monthly net income is Two Thousand Seven Hundred Sixty–Five Dollars ($2,765.00). *Transcript*, p. 21.

He further testified that his home is listed at One Hundred Twenty–Five Thousand Dollars ($125,000.00) although he feels that Eighty–Three Thousand Dollars ($83,000.00) may be a more realistic figure of its value. *Transcript*, p. 22. Mr. and Mrs. Hammon live in a household with their twenty–two (22) year old daughter who is not now being supported by the Hammons.

Their current monthly mortgage payments total Twelve Hundred Fifty Dollars ($1,250.00) which are not affordable and it is for that reason that the house financing must be renegotiated or the house must be surrendered or sold.

Mr. Hammon has no medical problems that affect his ability to be employed or earn a livelihood.

Mrs. Hammon has recently entered the work force.

Mrs. Hammon testified that she has been working at Wal–Mart as a store trainer for the past six (6) months, working at an hourly rate of Six and 75/100 Dollars ($6.75). She further testified that she was twelve (12) credits short of her Bachelor's Degree and she ceased her education because her grades went down and they only had one car.

As we discussed earlier, it is the Debtor's obligation to go forward with various specifics that render the repayment of a student loan an "undue hardship".

Based on what this Court has heard, the Debtors have established that they live in a house that they will probably surrender because they cannot afford it; that Mrs. Hammon has recently joined the work force and can contribute to family income; that Mr. Hammon has had significant income which he voluntarily surrendered by changing jobs; and that there is a tax indebtedness of an unknown amount that must be repaid.

As Jeanine Fox benefitted from a specific articulation of those facts upon which this Court could find an undue hardship, the Hammons suffer from the failure to articulate, with any specificity, the burdens created by the repayment of the student loan.

We find that the male Debtor has a significant income potential. We find that the female Debtor is joining the work force. We find that the two Debtors can share a household without any dependents. We have no idea what their current expense requirements are or how it would change in the coming decade. In short, we cannot find the kind of facts that will allow us to conclude that the Debtors have met their burden of going forward with evidence of undue hardship.

Accordingly, we conclude that the student obligations of James J. Hammon and Elaine D. Hammon are not dischargeable.