In re Terry Y. MAYER, Debtor.

Terry Y. MAYER, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Defendant.

In re Natalie R. QUEEN, Debtor.

Natalie R. QUEEN, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Richard Riley, Secretary, United States Department of Education, Defendants.

Natalie R. QUEEN, Plaintiff,

v.

ILLINOIS STUDENT ASSISTANCE COMMISSION, Defendant.

Bankruptcy Nos. 95–14102DAS, 95–19942DAS.
Adversary Nos. 96–0363DAS, 96–0364DAS, 95–0852DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

July 19, 1996.

Terry Y. Mayer, Norristown, PA, Pro Se in Adv. No. 95–0852.

Rosetta B. Packer, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, PA, for Debtor Queen.

K. Kevin Murphy, Pennsylvania Higher Education Assistance Agency, Harrisburg, PA, for Pennsylvania Higher Education Assistance Agency.

David J. Hershman, Chicago, IL, for Illinois Student Assistance Commission.

Virginia R. Powel, Asst. U.S. Attorney, Philadelphia, PA, for Richard Riley, Secretary, United States Department of Education.

Christine C. Shubert, Trustee (in both cases), Tabernacle, NJ.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The three above-captioned proceedings seeking to declare student loan indebtedness of two different debtors dischargeable under 11 U.S.C. § 523(a)(8)(B) represent our first attempts to grapple with the three-part test for "undue hardship" recently established in *In re Faish*, 72 F.3d 298, 304–06 (3d Cir. 1995), *cert. denied*, — U.S. ——, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996). They also cause us to prepare the most comprehensive formally published opinion directly addressing the § 523(a)(8)(B) standards since we

established objective standards for doing so in *In re Bryant*, 72 B.R. 913, 914–19 (Bankr. E.D.Pa.1987). The *Bryant* test, emphasizing the issue of whether or not the debtor's income exceeded the established federal poverty guidelines, though it proved workable in practice, not only became obsolete in light of the 1990 Bankruptcy Code amendments extending non-dischargeability of student loans to Chapter 13 cases, but also was expressly rejected in *Faish*. 72 F.3d at 304.

The instant very differently-situated two debtors have in common the attainment of a bachelor's degree from college as a fruit of their respective student loans, which often would preclude their successful invocation of § 523(a)(8)(B). However, in the one case before us, birth of a child has forced the debtor onto the welfare rolls and back into her mother's home in public housing for an indefinite period of time. In the other, very unusual case, the debtor has been unable to obtain employment and is also forced to reside with her parents, because of a clearly manifested severe mental illness which she and her parents continue to deny. As a result, we find that all three prongs of the *Faish* test are satisfied as to both debtors, and that all of the student loans in issue must be discharged.

### B. FACTUAL AND PROCEDURAL HISTORY

#### 1. Natalie R. Queen ("Queen").

Queen filed a Chapter 7 bankruptcy case on December 22, 1995, having obtained free *pro bono* counsel through a nationally-recognized program established by our local bar. *See* D. Sykes, *The Consumer Bankruptcy Assistance Project*, 13 ABI J. 1 (No. 7, Sept. 1994). On April 9, 1996, she commenced two separate adversary proceedings, one naming the PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY ("PHEAA") and RICHARD RILEY, SECRETARY, UNITED STATES DEPARTMENT OF EDUCATION ("the DE") as defendants, and the other naming the ILLINOIS STUDENT ASSISTANCE COMMISSION ("ISAC") as a defendant. The DE answered that it neither holds nor owns

Queen's student loan notes, and requested that no relief be granted against it. Our order *sub silentio* accedes to this apparently uncontested request. After one continuance, the Queen matters were heard in a consolidated trial of July 9, 1996, at which Queen was the only witness.

Queen testified that she was 28 years of age, unmarried, was a single parent of a 20–month–old daughter, and had, since filing her case in Philadelphia, moved with her daughter to her mother's public housing unit in Riverside, Connecticut. The parties apparently agreed that Queen had obtained loans totalling in excess of $11,700, ultimately generated by ISAC, to attend St. Augustine's College in Raleigh, N.C., from which she graduated with a bachelor's degree in 1989. Being able to obtain employment only as a non-salaried commissioned sales representative at her home in Connecticut, she relocated to Raleigh in November 1989, where she could obtain only part-time employment with United Parcel Service.

In January 1992, Queen moved to Philadelphia to enter a master's degree program at Temple University, in the course of which amassed loans in excess of $9,000, guaranteed by PHEAA, without obtaining a further degree. In October 1992, she obtained work as a full-time "casual" (non-tenured) employee at the United States Post Office ("the USPO"), earning between $6.50 and $7.00 hourly. In September 1994, she took maternity leave from that employment. Her attempt to return to the USPO was allegedly thwarted by a misunderstanding over her leave request. Thereafter, she broke up with her child's father, who pays no support, and began receiving public assistance.

As mentioned previously, in early 1996 Queen and her daughter relocated to her mother's public housing unit in Connecticut. She presently receives welfare benefits of $513 monthly and additional employment income of about $100/weekly from a part-time sales clerk job. Her income was reported at $977/monthly and her expenses as $920/monthly. She shares the rent and utilities of her mother's public housing unit, and she and her daughter sleep in its living room. Queen is pessimistic about prospects of more extensive employment because any salary from a full-time job would be offset by day-care costs, which she stated that she had priced between $250 and $1,000 per month.

Queen's loan payments were deferred until July 1993. She made two payments of $92.24 each in September and October, 1993, but none thereafter.

### 2. Terry Y. Mayer ("Mayer").

Mayer's Chapter 7 case was filed on May 30, 1995, by James W. Flood, Esquire, a private attorney ("Flood"), and was uneventfully closed after Mayer's discharge on September 21, 1995. However, on November 2, 1995, Mayer's case was reopened on motion of Flood, for the sole purpose of filing the instant proceeding brought by Mayer under § 523(a)(8)(B). Flood proceeded to file the proceeding before us on November 6, 1995, naming PHEAA as the sole defendant. This proceeding was initially listed for trial on December 19, 1995.

On December 5, 1995, Mayer forwarded a personal letter, embellished with numerous lengthy exhibits, directly to this court. After scanning these materials for possible issues which were relevant for this court to address, we ascertained that these materials were highly critical of Flood, with no particular basis, and included numerous personal recitations which appeared to have no relevance to the proceeding. On December 7, 1995, we wrote to counsel for both parties in the case, with a copy to Mayer, informing them that this *ex parte* communication had been received by the court from Mayer. We indicated that, while we would ordinarily forward copies of such a communication to counsel immediately, we were reluctant to share these because of their apparent personal nature. We also admonished Mayer for dispatching any such communications to the court.

In a letter to this court dated December 19, 1995, on which date the trial was continued until February 13, 1996, PHEAA's counsel expressed concern that we had "examined" Mayer's *ex parte* letter and asked that the materials be shared with both counsel. Under cover of a letter dated December 22,

1995, we then forwarded a copy of the materials to both counsel, sending a copy of this letter to Mayer.

We next received a copy of a letter from Mayer to Flood dated February 10, 1996, in which Mayer purported to fire Flood and demanded a refund of all of the legal fees ($500) that she paid to him.

Both counsel appeared for trial on February 13, 1996. However, Mayer was not present. Flood telephoned Mayer at her home at the court's request to find out why she had not appeared. Mayer then called our chambers, and insisted on speaking with this court privately in a manner which our judicial assistant found overly-aggressive. Instead, we asked both attorneys to speak with Mayer. After doing so, they reported that Mayer refused to appear in court that day for trial. At Flood's request in order to, *inter alia,* permit him to withdraw as counsel and PHEAA to attempt to obtain discovery, we agreed to again continue the trial until April 23, 1996.

On February 23, 1996, PHEAA filed a motion requesting this court's recusal, contending that certain language in the order of February 13, 1996, granting a final continuance of the trial, *i.e.,* our reference to "inappropriate communications to the court by the Debtor which may be symptomatic of severe mental illness" and the statement that "the Debtor, … appears to be operating under an impairment," evidenced "preconceived notions concerning the debtor's alleged medical condition and mental state despite the fact that no proper or competent medical evidence has been introduced in substantiation of this conclusion." PHEAA also alleged that "the *ex parte* communications have had the effect of predisposing the court's opinion concerning the Debtor's ability to possibly repay this loan."

Hearings on the recusal motion and on Flood's motion to withdraw as counsel were listed on March 28, 1996. We granted the motion to withdraw on that date and denied the motion to recuse in a Memorandum and Order of April 2, 1996, reported at 1996 WL 156536 ("the Memo"). In rendering the latter decision, we relied principally upon *Liteky v. United States,* 510 U.S. 540, 114 S.Ct.

1147, 127 L.Ed.2d 474 (1994), finding that the "extrajudicial source" doctrine, as applied in that case, precluded the motion. 510 U.S. at ——, 114 S.Ct. at 1157. We noted, in the Memo, at *4, that "the materials submitted by the Debtor appear, as they would to any person, to reflect that the Debtor may suffer from some form of mental illness or impairment." We also noted the "rather obvious inappropriate actions by the Debtor" and that "the Debtor [had] behave[d] erratically, as, for example, her refusal to appear at the trial in February." *Id.*

The Debtor appeared, with her father James Mayer, at the trial of April 23, 1996. The Debtor took the stand and, while her recitations established that she was a very intelligent and sensitive person capable of reciting chronological facts quite accurately, she provided several rather bizarre explanations for some of the important setbacks in her life. She also presented a highly argumentative, abrasive, and inappropriately disrespectful demeanor as soon as any of her analyses were questioned.

The Debtor testified that, beginning in 1974, she attended nine different colleges over a fifteen-year period in order to attain her bachelor's degree in her chosen field of teaching. Her longest attendance was at LaSalle University, where she claimed that a financial aid officer blocked her graduation. She then transferred to St. Joseph's University in 1984, where she obtained a degree, allegedly overcoming efforts to prevent her graduation by the same financial aid officer, who she claimed also transferred to St. Joseph's.

Mayer then worked as a substitute teacher in the Philadelphia School District ("the PSD") from 1985 through 1989. She attributed her failure to obtain a permanent position with the PSD to a refusal of certain state officials to provide her with duly-earned teaching certificates. She then taught at private institutions, Ivy Leaf School from 1989 to 1990; Edge Institute at some time in, apparently, 1990; and Lutheran High School from September 1990 to January 1991. She attributed her departure from Lutheran High to a dispute over an administrative

decision regarding treatment of one of her students.

Since 1991 she has had only "little jobs," such as marketing research and telemarketing. Her last job, in marketing research, ended in October 1995, after which she received unemployment compensation, which has now expired. She reported earnings of about $5,000 in 1995, but little income in any other years since 1990. She described constant efforts at obtaining employment, including sending out numerous resumes weekly, mostly to obtain teaching positions. A few of these applications apparently resulted in very short-term employment.

Mayer contended that she repaid over $500 to PHEAA between 1985 and 1989. PHEAA's witness, Laurie Lint, claimed a record of only one payment, in December 1991. Lint testified that Mayer's balance due to PHEAA was $24,483.93.

Despite rather gentle cross-examination from PHEAA's counsel, Mayer became increasingly hostile to the questions, making sarcastic comments and vague references, at various times in the proceedings, to, *inter alia*, President Clinton, Philadelphia Mayor Rendell, the MOVE bombing incident, and the Holocaust. She took great offense to an' offhand reference of the court to the fact that she was black, claiming that she was, in fact, a "Native American Jew." However, when both she and her father, who briefly took the stand, were asked by the court as to whether they believed that Mayer might be suffering from mental illness, both firmly denied any such possibility. Nevertheless, despite Mayer's vigorous protestations, we indicated, at the close of the trial, that we believed that mental illness was the primary cause of Mayer's inability to retain employment.

In contemplating how we would render our decision after this rather unique trial, we reached the conclusion that any person who acted in the manner of Mayer at the hearing, and in her *ex parte* contacts to the court and court employees, would be very unlikely to obtain employment due to her obvious manifestations of severe mental illness. However, we also recognized that neither party would support a decision on this basis. PHEAA had already, we believe erroneously,[1] asserted that, without professional psychiatric basis, *we* were not competent to assess Mayer's mental health, and had gone so far as to allege, in its motion for recusal, that our suggestions to the contrary were reflective of improper bias in favor of Mayer. Meanwhile, Mayer, though periodically expressing irrational anger with, and paranoia regarding, PHEAA, was adamant in denying her mental illness. Rather, she attributed her inability to obtain employment to conspiracies against her by PHEAA, her college financial aid officers, state teaching certification authorities, and/or a combination of the foregoing. Moreover, her self-perception as a mentally healthy person was shared by the only parties likely to intervene and convince her to get treatment, *i.e.*, the parents with whom she lived. We therefore decided to attempt to reinforce our impressions with professional assistance by ordering Mayer to undergo a psychiatric evaluation. The propriety of this action was also supported by our desire to help a needy human being who

---

1. It is clear, under federal and Pennsylvania law, that evidence of competency of an individual can be supported by lay, as opposed to expert, testimony. *See, e.g., Connecticut Mutual Life Ins. Co. v. Lathrop*, 111 U.S. 612, 619–22, 4 S.Ct. 533, 536–38, 28 L.Ed. 536 (1884); *Libertelli v. Hoffman–LaRoche, Inc.*, 565 F.Supp. 234, 237 (S.D.N.Y.1983) (jury may prefer lay testimony to that of a psychiatrist to the contrary); *Rambler v. Tryon*, 7 Serg. & Rawle 90, 94 (Pa.1821); and Annot., *Requisite Foundation or Predicate to Permit Nonexpert Witness to Give Opinion, in Civil Action, as to Sanity, Mental Competency, or Mental Condition*, 40 A.L.R.2d 15, 23–25, 64–65, 91 (1955).

It can be readily inferred from this conclusion that this court, sitting as fact-finder, can make a determination relative to mental competency without the benefit of supportive expert testimony. Moreover, the fact that the party whose mental health was at issue appeared before this court renders this determination far easier than in cases where non-expert testimony of behavior of the party at issue was the only evidence before the court, as in the foregoing cases. *See also In re Schulz*, 318 Pa. 110, 177 A. 798 (1935) (lower court determination of competency, based on alleged incompetent's testimony to the court, affirmed). The issue before this court was, moreover, not the more difficult determination of mental competency, but merely whether Mayer's mental health would impact on her employability.

seemed unlikely to receive a catalyst for therapeutic intervention from any other source.

Therefore, after consulting the telephone directory and determining his willingness to assist the court at a reasonable cost, we entered an order of April 26, 1996, pursuant to Federal Rule of Bankruptcy Procedure 7035, incorporating Federal Rule of Civil Procedure 35(a), and Federal Rule of Evidence 706(a), appointing Dr. Clancy McKenzie of the Philadelphia Psychiatric Consultation Services as an impartial psychiatric expert in this proceeding. The Debtor was directed to call Dr. McKenzie to make an appointment and to thereafter submit herself to Dr. McKenzie for an examination with respect to her mental condition on or before May 10, 1996. Dr. McKenzie was, thereafter, to file a brief diagnosis of the Debtor's mental health, how her mental condition would affect her employability, suggested treatment (if any), prognosis upon treatment, the anticipated duration of any disease identified, and the anticipated period for which any finding of unemployability could be expected to last. The cost of the examination and report, which Dr. McKenzie certified would not exceed $200, was to be ultimately charged to the party who prevailed in the litigation, although each party was preliminarily directed to advance $100, payable to the Clerk, toward this expense.

As we feared might transpire, Mayer refused to comply with this Order. Also, on May 7, 1996, PHEAA filed a motion seeking reconsideration of the April 26, 1996, order, apparently on the ground that this order was improperly entered *sua sponte*. Therefore, on May 21, 1996, we entered a further order,[2] "noting that the Debtor has not cooperated with any aspect of this Order, but rather that she and her mother have engaged in argumentative behavior with court officers and Dr. McKenzie, which reflects disagreement with entry of the Order (but is consistent with the indication that the debtor suffers from mental illness and that she and her

family irrationally deny such illness)," and scheduling a hearing on June 6, 1996, "at which any of the interested parties can appear, briefly express their dissatisfaction with any aspect of the Order, and offer alternatives to any aspect of the Order which will allow this court the opportunity to assess the Debtor's employability, ..." We cautioned Mayer that, if she continued to refuse to comply with the order and offered no explanation for her failure to do so at the aforementioned hearing, we might be compelled to dismiss this proceeding without prejudice on that basis.

Predictably, the hearing of June 6, 1996, was made unpleasant by the participation therein by Mayer, who attended with both of her parents. For its part PHEAA rested on the myopic assertion in its motion for reconsideration that, because both Mayer and her father denied her mental illness, there was no basis for appointment of an expert to assess same.

In the course of diatribes which she was now inclined to direct to the court as the latest scapegoat for her difficulties, Mayer contended that she was unable to pay her $100 deposit to Dr. McKenzie and made certain statements which appeared to indicate, contrary to previous denials of psychiatric treatment in the past, that she had been, and/or presently was, treated by a psychiatrist. Her mother, while still denying Mayer's mental illness, somewhat inconsistently attributed some of her unusual behavior to trauma suffered in a rape, an incident also referenced in Mayer's December 5, 1995, letter to this court. We therefore entered our Order of June 7, 1996, amending our April 26, 1996, order, to allow Mayer to produce, to the Clerk of this court, copies to the court and counsel, "the evaluation of her mental condition by any certified physician, psychiatrist, or psychologist," as an alternative to her making an appointment with Dr. McKenzie. We also stated that we would request that Dr. McKenzie waive the $100 contribu-

2. In a footnote to that order, we supported our actions as following the principles enunciated in F. VanDusen, *A United States District Judge's View of the Impartial Medical Expert System,* 32

F.R.D. 498, 516–20 (1963), observing that our April 26, 1996, order was modeled after the sample presented by Judge VanDusen which was published in 32 F.R.D. at 522–23.

tion from Mayer upon her contacting him.[3] A further status hearing of July 11, 1996, was scheduled to determine whether Mayer had complied with this order and to determine what course this court would take if she failed to do so. Mayer was again "cautioned that if she continues to refuse to comply with the Order of this court, this court may be compelled to dismiss this proceeding without prejudice."

As might have been expected, Mayer failed to comply with the June 7, 1996, order. In a hearing of July 11, 1996, in which we allowed counsel for PHEAA to participate by telephone, Mayer and her father appeared. While Mayer was initially reserved and respectful to the court, when we persisted in suggesting that she appeared to be suffering from mental illness, Mayer ultimately became verbally abusive to us and indicated a desire to join PHEAA's request for our recusal.

Despite our lack of success in leading Mayer to what we believe is treatment which could lead to her rehabilitation, we do not discount our efforts in this endeavor as entirely fruitless. We believe that we may have touched a chord of insight in Mayer which will lead her to seek treatment. The over-reactive resistance of Mayer to our assessment of mental illness as her root problem not only indicated some inner conflict regarding her expressed over-confidence in her mental health, but also it eliminated completely any possibility that her behavior was feigned. It strongly reinforced our assessment that, while Mayer is extremely intelligent and has potential for employment in very challenging work, her mental illness is very severe and will preclude any permanent employment at present. This assessment is based on our perception that Mayer is quite articulate and engaging until one of her assertions is questioned. She then becomes highly emotional and angrily resistant. Without purporting to claim expertise, we understand that this is classic schizophrenic behavior. Irrespective of the professional nomenclature, we express, in as clear terms as possible, that, while Mayer may be capa-

ble of obtaining employment, it is clear to anyone perceiving her in an environment which, like most workplaces, was stressful, her mental condition is of such severity that she is obviously totally unemployable, for this reason alone. We also believe that this series of events establishes that it will be most difficult, because of the very nature of her illness, for Mayer to initiate the treatment which might cure her. Her parents have not proven to be a resource in assisting her in any endeavor to seek professional help.

The only power that we could wield to intervene in the downward spiral created by this illness was the threat of dismissal of her proceeding against PHEAA if Mayer refused to cooperate. Even this was unsuccessful, although we were obliged to continue our threat to the end. We must observe, however, that to enforce our threat to dismiss the proceeding because of Mayer's failure to comply with our orders, tempting as this might be, would, in the final analysis, be internally inconsistent. Since we conclude that Mayer is severely mentally ill, we cannot hold her totally responsible for actions, even contempt of this court, which were driven by that very illness. We are therefore faced with the prospect of rendering a decision in Mayer's § 523(a)(8)(B) proceeding, knowing that it will be, unlike the decision as to Queen, equally as unpopular with the debtor as with PHEAA.

## C. DISCUSSION

### 1. THE CURRENT TEST FOR DISCHARGEABILITY OF STUDENT LOAN DEBTS UNDER § 523(a)(8)(B) IS ESTABLISHED FOR THIS CIRCUIT IN FAISH.

*Faish* establishes a specific, fairly flexible test for bankruptcy courts in this Circuit for determining whether a student loan is dischargeable under 11 U.S.C. § 523(a)(8)(B). We begin our application of the facts of these cases to that test by quoting 11 U.S.C. § 523(a)(8):

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title

---

**3.** Since PHEAA belatedly made its $100 payment, and Dr. McKenzie's services were never utilized, our accompanying order directs the clerk to refund that payment to PHEAA.

does not discharge an individual debtor from any debt. . . .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; [4]

(B) excepting such debt from discharge under this paragraph will impose undue hardship on the debtor and the debtor's dependents; . . .

■ The test adopted in *Faish*, expressly following *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir.1987), requires that a debtor invoking § 523(a)(8)(B) prove the following:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Accord, e.g., In re Cheesman*, 25 F.3d 356, 359 (6th Cir.1994); and *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir.1993).

### 2. A REQUIEM FOR BRYANT.

Since no one else is likely to do so, we add a few post-mortems on *Bryant*, which the *Faish* court effectively executed. 72 F.3d at 304. *Bryant* was filed before *Brunner*, and

is in fact cited and referenced more favorably by the *Brunner* court, 831 F.2d at 396, than by the *Faish* court.

As the court lucidly and correctly explains in *In re Fox*, 163 B.R. 975, 979 (Bankr. M.D.Pa.1993), the *Bryant* test was very harsh on Chapter 7 debtors, since it required a successful § 523(a)(8)(B) plaintiff to establish income at or near the poverty guidelines. *Compare In re Ammirati*, 187 B.R. 902, 906 (D.S.C.1995) ("minimal standard of living" is not co-extensive with poverty guidelines); *In re Hoyle v. PHEAA*, 199 B.R. 518, 523 (Bankr.E.D.Pa.1996) (rejects argument that § 523(a)(8)(B) plaintiff must have income beneath the poverty guidelines); and *In re Correll*, 105 B.R. 302, 306 (Bankr.W.D.Pa. 1989) ("We do not believe, . . . that Congress intended a fresh start under the Bankruptcy Code to mean that families must live a poverty level in order to repay educational loans . . . Use by the Bankruptcy Courts of poverty level or minimal standard of living guidelines is not necessary to meet the congressional purpose of correcting 'a few *abuses* of the bankruptcy law by debtors with large amounts of educational loans . . .' ").

As *Fox* notes, 163 B.R. at 979, our rationale for adopting this text in *Bryant* was reflected by our statement that

"we do not believe that the definition of 'undue hardship' so as to allow the discharge of student loans obligations in Chapter Seven cases should be interpreted liberally, given that debtors may obtain the complete discharge of student loan obligations by filing a Chapter Thirteen petition instead of a Chapter Seven petition." *In re Bryant, Id.* at 917. In 1990, Congress amended the discharge provisions of Chapter Thirteen by excepting debts arising under Section 523(a)(8)

---

**4.** Because we believed that the facts of her case rather clearly satisfied the requirements of § 523(a)(8)(B), *see* pages 125–28 *infra*, we have not explored the possibility that some or all of Mayer's loans, which financed education completed over twelve (12) years ago, could be discharged under § 523(a)(8)(A). It is possible, but not certain, that these loans were suspended by deferments until 1991 due to Mayer's teaching

career. If the result here is modified on any possible appeal, it would be worthwhile to explore this issue. It was not raised by Flood, or Mayer acting *pro se*, to date, but this would not appear to preclude its invocation in any subsequent state-court collection proceedings. Therefore, if the result is modified, this issue should probably be remanded to this court.

from discharge under a Chapter Thirteen plan. Therefore, the reason for Judge Scholl's reluctance to interpret the Chapter Seven student loan discharge liberally has been removed by Congress in 1990. We acknowledged, as *Fox* expressly holds, that the extension of § 523(a)(8) to chapter 13 cases in 1990 justified a revision of the strict *Bryant* test in *In re Patronek,* 121 B.R. 728, 729 n. 1 (Bankr.E.D.Pa.1990). However, to our surprise, no debtor ever asked us to revise our *Bryant* test in light of the 1990 Code amendments.

Given the obsolescence of *Bryant*'s harshness, the comments of the court in *Faish* regarding the *Bryant* test, which suggest that it is in some respects too liberal to debtors, seem somewhat ironic. The difficulties which the *Faish* court finds with the *Bryant* test are that it disregarded (1) the debtor's expenditures, and (2) the role of student loans in the debtor's motivation for filing bankruptcy. 72 F.3d at 304. However, although the *Faish* court seems to assume that de-emphasizing the debtor's expenditures is favorable to debtors, in fact disregarding expenditures would appear to us to almost always work in the lender's favor, since very few debtors except those compelled to do so can live within the poverty guidelines. *See, e.g., In re Johnson,* 121 B.R. 91, 92, 94 (Bankr.N.D.Okla.1990) (debtor earning well over the poverty guidelines discharged because expenditures exceeding income); and *Correll, supra,* 105 B.R. at 306–07, 308–09 (same, for three sets of debtors discharged). Also, we fail to see where the debtor's motivation for a bankruptcy filing fits into the tripartite *Brunner* test. Rather, it appears that the *Faish* court, 72 F.3d at 303–04, threw out separate consideration of that issue with its rejection of the "policy test" articulated in *In re Johnson,* 5 B.C.D. 532, 544 (Bankr.E.D.Pa.1979).

[■] PHEAA has suggested, in argument to the court in the Queen matter, that the *Faish* court meant to retain the *Bryant* criterion for determining whether the first of the tripartite *Brunner* tests (whether the debtor can maintain a minimal standard of living) are met. We do not agree. Rather, like the *Cheesman* court, which also adopted the *Brunner* test, 25 F.3d at 359–60, the *Faish* court appears to direct that a bankruptcy court take a broader view of the debtor's financial circumstances than we did in *Bryant.* In its analysis regarding the first prong of the *Brunner* test, 72 F.3d at 306–07, the *Faish* court makes no mention of the fact that the *Faish* debtor's income is over twice that of the applicable poverty guidelines, *see* 61 FED.REG. 8286 (March 4, 1996) (poverty level for a family of two is presently $10,360), which would have quickly resolved that issue without the need for further discussion if that aspect of the *Bryant* text had been applied. *Accord, Hoyle, supra,* 199 B.R. at 523–24 (poverty guidelines are not an aspect of the *Brunner* test). Thus, while income below the poverty line should generally be a sufficient condition to satisfy the first *Brunner* prong, *compare Cheesman, supra,* 25 F.3d at 359–60, it should not be a necessary condition to satisfy that prong of the three-part test.

*3. APPLICATION OF FAISH TO THE INSTANT FACTS.*

[■] All that remains is applying the *Brunner–Roberson–Cheesman–Faish* tripartite test to the facts of Queen's and Mayer's particular factual circumstances.

We conclude that both debtors satisfy the first prong, *i.e.,* the "sparse current excess income test." Since Mayer's unemployment compensation benefits are exhausted, and she has no reasonable prospects of re-employment, she has no income whatsoever and is completely dependent on her aging parents for support. She clearly satisfies the first test under these circumstances.

Queen's situation is only slightly less problematic. It is true that Queen's income, though largely consisting of public assistance, slightly exceeds both the applicable poverty guidelines, 61 FED.REG. 8286, *supra,* and her reported expenses. However, this is because she has minimized her expenses by reducing the standard of her living conditions to those which can only be described as sub-poverty level. She left her own dwelling in Philadelphia, and moved back home, with her baby, to live in a crowded public housing unit with her mother and her family. In so doing,

Queen has demonstrated her recognition of a need to drastically economize her expenditures, far beyond that which most persons, indeed most debtors, would be willing to endure. She could probably live more cheaply only if she chose to become a homeless person. We consider Queen's present living standard sub-minimal, but the best that she can do at present for her and her baby. Any added expenses would simply be intolerable to impose upon her at present. *Compare In re Skaggs,* 196 B.R. 865, 867–68 (Bankr. W.D.Okla.1996) (husband and wife, earning $36,000 annually as teachers, who were required to live with their three children in a mobile home and forego, *inter alia,* vacations and movies, discharged due to their inability to further reduce their "extraordinarily frugal" lifestyle).

The second prong of the *Brunner* test requires consideration of whether additional circumstances exist which indicate that no change in a debtor's financial state of affairs is likely to transpire for a "significant portion" of the loan repayment period. Again, we begin by discussing Mayer's fact situation because, despite the unusual aspects of her case, the satisfaction · of each prong of the test is the more obvious as to her between the two debtors.

We find that, in her present state, Mayer is totally unemployable. We note that, in the twelve (12) years since her graduation, Mayer has never worked at any full-time position in her chosen field of teaching for more than a few months. We suspect that her condition has regressed without apparent treatment, because we do not believe that she could cope with any classroom situation involving spunky (or worse) children at present. We observe that she has held no teaching position for more than a few days duration since January 1991. Like PHEAA, we see no problems with her teaching certifications, which Mayer seems to insist preclude her eligibility from most teaching jobs. Mayer's only regular employment since 1991 appears to be her position in marketing research in 1995. It is difficult for us to see how she could successfully perform even that, or any, job for any substantial duration of time, given her present mental health.

It is difficult for us to precisely assess Mayer's prognosis for recovery without the professional evaluation resisted by both Mayer and PHEAA. We did observe high intelligence and a love of children and the teaching profession through Mayer's appositional veneer, which could make her an exceptional teacher. However, our best efforts to direct Mayer to the treatment she obviously needs before she could perform any such services was spectacularly unsuccessful. It is unclear whether anything other than a damaging destructive act will change her course of refusing to recognize her problem or receive treatment for it. Unfortunately, we must hence conclude that the duration appears chronic. The second prong of the *Brunner* test is therefore satisfied as to Mayer.

PHEAA and ISAC devoted most of their attention, in the Queen case, to arguments that Queen failed to meet this prong of the tripartite test. They noted that her baby daughter will, in the normal course of events, attend school within four years, purportedly allowing Queen to obtain full-time employment at this juncture. Apparently they reference decisions such as *In re Koch,* 144 B.R. 959, 963 (Bankr.W.D.Pa.1992), in which Judge Markovitz cites his own cases as authority for the principle that, since educational loans allegedly typically extend for ten (10) years, the court must project whether an improvement in the debtor's circumstances is likely to occur over the next ten (10) years in applying the second prong of the *Brunner* test.

The *Faish* court did not reach the second prong in its analysis. 72 F.3d at 306. *Cheesman,* 25 F.3d at 360; *Roberson,* 999 F.2d at 1137–38; and *Brunner,* 831 F.2d at 396–97, did. However, none of these cases suggest that a ten (10)–year durational period for measuring potential changes in a debtor's circumstances is normative.

■ There is no evidence regarding the repayment period of the particular loans in issue, but, assuming the *Koch* court's 10–year durational estimate of such loans is applicable, the second *Faish* prong requires examination of only circumstances over the duration of *a significant portion* of the loan repayment period, not the entire period. It

is apparent that, the further one attempts to project into the future, the more uncertain the prediction becomes. Since a significant portion of the loan would be repaid prior to even the mid-point of the repayment period, we do not believe that applying the second prong of the *Brunner* test requires us to look more than five years into the future.

It is true that, in the ordinary course, Queen's daughter would be in first grade in five years. However, it is unclear to us that care of a child of that age, particularly during summer and other vacations, would not need her mother's constant care. Moreover, the daughter has been fitted with a leg brace, which may reflect a disability. Of course, anything could happen in the next five years. Queen is a healthy young woman capable of bearing more children. On the other hand, she may unexpectedly obtain a high-paying job, win the state lottery, or meet and marry a professional basketball player. *See Vaughn v. Illinois State Scholarship Comm'n,* 151 B.R. 481, 486 (C.D.Ill.1993) (reversing bankruptcy court's denial of discharge of a student loan debt, court observes that, if a finding of undue hardship is rejected because a debtor might get a good paying job, "a debtor could never discharge a student loan because the debtor always has, at a minimum, the potential to find a good paying job").

We do note, however, that, even before Queen became pregnant with her daughter, she had never attained secure or lucrative employment. Despite a willingness to relocate from Connecticut to North Carolina to Philadelphia and back to Connecticut again, the best job that Queen ever obtained was as a "casual" USPO employee in Philadelphia earning, at most, $7.00/hr. Subtracting child-care costs, and even making an allowance for Queen's possible over-estimate of $250 to $1,000 monthly for child-care costs, from this salary, would leave Queen with income which is still close to the poverty line for a family of two.

In *Brunner* and *Roberson,* the courts found that the respective debtors did not satisfy the second prong of the *Brunner* test. However, both involved single persons with no dependents, and the *Brunner* debtor had obtained a master's degree. 831 F.2d at 397. The *Roberson* debtor was allowed a two-year deferment to overcome certain apparently non-permanent injuries, after which his circumstances would be reassessed, and he had at one time earned in excess of $30,000 annually. 999 F.2d at 1137–38, 1134. The *Cheesman* debtors, who were discharged from their debts, were a married couple with two children, aged 7 years and 14 months. 25 F.3d at 358. Both debtors were college graduates with full-time employment experience in the teaching profession. *Id.* The husband netted about $1,160 monthly. The court was not troubled by the husband's chances for a promotion nor the wife's ability and intention to re-enter the job market, as it was impressed by the debtors' choice of "worthwhile, albeit low-paying, professions" (teaching, incidentally Mayer's chosen profession). *Id.* at 360.

Queen's prospects for increased income seem nowhere near as likely or imminent as those of the *Brunner, Roberson,* or particularly the successful *Cheesman* debtors. We therefore conclude that Queen has proven satisfaction of the second prong of the applicable test.

■■■ The only remaining element is measurement of good faith efforts of Queen and Mayer to repay their loans. *Faish* further explains this prong of the test by describing it, 72 F.3d at 305, as

> the good faith inquiry.... [which] ... is to be guided by the understanding that "undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Id.* (quoting Comm'n on the Bankruptcy Laws of the United States Report, [H.R.Doc. No. 137, 93d Congress, 1st Sess., Pt. II], at 140 n. 16).

As so explained, this factor measures not simply whether or not a debtor has paid towards a student loan debt in the past, but emphasizes whether or not that debtor has maximized financial resources in order to prevent a default and has allowed sufficient time before declaring bankruptcy to obtain

the job sought when the education in issue was being obtained. This factor was not applied in *Faish*, 72 F.3d at 306, nor *Roberson*. 999 F.2d at 1138. "[M]inimal payments on their loans" by the *Cheesman* debtors in the several years since their loans were made were found to have satisfied this prong. 25 F.3d at 360. The *Brunner* debtor was chastised for seeking a discharge in the very month when her first payment became due. 831 F.2d at 397. Therefore, in applying this last prong of the test, the courts have focused on whether debtors have waited a reasonable period of time after the loans become due before filing bankruptcy to attempt to discharge them. *See also Hoyle, supra,* 199 B.R. at 524–25.

Both debtors rate highly on this score. Mayer's loans were accumulated over a decade before she filed bankruptcy. Queen incurred her initial, larger loans over seven years ago, and attempted to better herself by re-entering school in 1992. She waited another period of over three years after leaving graduate school before she filed bankruptcy. Further, we perceive no element of reluctance on the part of either debtor in seeking employment. Mayer continues to send out numerous resumes weekly, though we suspect that same is futile because of her incapacity for work. Queen refused to accept welfare as her only income, and has obtained part-time employment despite her daughter's present very tender age.

Both of these debtors have made some payments on their respective loans despite their lack of success in obtaining employment in the fields envisioned when they obtained their education. Mayer claimed to have made several payments prior to 1989, and just as vigorously stated that she made none in December 1991, when PHEAA credited what it claimed was her only payment. Mayer's testimony is more convincing on that point than PHEAA's records. It is likely that December 1991 reflected PHEAA's recordation of what were in fact earlier payments by Mayer. Queen made two payments during the duration of her best-paid employment which, as we have noted, was itself not very lucrative. Neither debtor ever obtained a reasonably well-paying job in their chosen fields. Given their circumstances, it was difficult to expect them, or

any similarly-situated debtors, to have made *any* payments. Their efforts to do so clearly satisfy the third prong of the applicable test.

### D. CONCLUSION

We will proceed to enter orders declaring the student loans of both of the instant debtors dischargeable under 11 U.S.C. § 523(a)(8)(B) upon our within application of the controlling standards articulated in *Faish.*