**In re Dallas R. CHEESMAN; Margaret J. Cheesman, Debtors.**

**Dallas R. CHEESMAN; Margaret J. Cheesman, Appellees,**

v.

**TENNESSEE STUDENT ASSISTANCE CORPORATION, Appellant.**

No. 93–5500.

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1994.

Decided June 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 4, 1994.*

---

* Guy, Circuit Judge, would grant rehearing for the reasons stated in his dissent.

William E. Young (argued), Tennessee Atty. Gen.'s office, Nashville, Tenn. (Charles W. Burson, Atty. Gen., on the brief), for appellants.

Thomas D. Beesley (argued), Crossville, Tenn., for appellees.

Before: MILBURN and GUY, Circuit Judges; and TIMBERS, Senior Circuit Judge **.

TIMBERS, Senior Circuit Judge, delivered the opinion of the court, in which MILBURN, Circuit Judge, joined. GUY, Circuit Judge (pp. 361–363), delivered a separate dissenting opinion.

TIMBERS, Senior Circuit Judge.

Appellant Tennessee Student Assistance Corporation (TSAC) appeals from an order entered in the Middle District of Tennessee, L. Clure Morton, District Judge, which (1) affirmed the bankruptcy court's order that appellees Dallas and Margaret Cheesman's student loans were dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B) (1988 & Supp. IV 1992), and (2) affirmed the bankruptcy court's eighteen-month stay of its order discharging the Cheesmans' loans.

TSAC contends (1) that the loans do not impose an undue hardship as required by § 523(a)(8)(B), and (2) that the bankruptcy court did not have authority pursuant to 11

** Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

U.S.C. § 105(a) (1988) to stay its discharge order.

We affirm.

## I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

On August 2, 1991, Dallas and Margaret Cheesman filed a Chapter 7 petition with the bankruptcy court. At that time, the Cheesmans had approximately $30,000 in outstanding debts, of which $14,267 was attributable to student loans guaranteed by TSAC. On November 20, 1991, the Cheesmans commenced an adversary proceeding to have their student loans discharged on the ground that the loans imposed an undue hardship pursuant to § 523(a)(8)(B). At a hearing on March 30, 1992, the following facts were presented.

In 1983, Margaret obtained two student loans with a total principal amount of approximately $5,000. These loans were guaranteed by TSAC, a nonprofit corporation created to administer student assistance programs. In 1984, she received a bachelor of arts degree from Middle Tennessee State University (MTSU), where she majored in English. After a six-month grace period and a five-month extension, the loans became due in June 1985. The monthly payments on these loans totalled $68. Only two payments were made on these loans: a $50 payment in March 1990 and a $50 payment in June 1990.

Subsequent to her graduation from MTSU, Margaret worked intermittently as a teacher's aide in the Cumberland County Alternative School between 1989 and 1991. During the months that she was employed, she worked approximately 35 hours a week and received an average gross monthly salary of $651. She took maternity leave from this position in 1991. When she reapplied in June 1991, she was informed that her position was no longer available. She then began to receive $53 a week in unemployment compensation. She continued to seek employment and was placed on the Cumberland Board of Education's preferred hiring list.

In February 1985, Dallas Cheesman received a $3,500 loan to attend MTSU to study educational psychology. This loan also was guaranteed by TSAC. Previously, he had obtained a bachelor of science degree from Austin Peay State University. He withdrew from MTSU in 1985 to take a second job. After a six-month grace period expired in December 1985, he was required to begin making monthly payments of $54. He made two $50 payments on this loan—one in January 1988 and the second in September 1988.

From October 1986 through October 1988, Dallas earned a gross salary of $1,538 a month as the director of the Giles County Alternative School. From November 1988 through May 1990, he earned a gross salary of $1,632 a month as a family worker in the residential treatment program for emotionally disturbed children at Eckerd Family Youth Alternatives, Inc. At the time the bankruptcy proceeding was commenced, he was employed as an early intervention specialist at the Plateau Mental Health Center. He earned a gross salary of $1,123 a month. After deductions for taxes and health insurance, he received $960 a month. He testified that he hoped to receive a promotion within the near future. He also had received $200 a month for part-time work at the local Teens Against Drugs Center until funding for this program ran out in February 1992.

In 1991, the Cheesmans' gross income was $15,676, leaving them a net income of $13,720. They provided the court with an expense chart listing monthly expenses that totalled $1,594. Included in this chart was the $100 monthly tuition to send their 7-year old daughter to private school (they also have a 14-month old son). Dallas testified that relatives provided most of the money for their daughter's tuition. The Cheesmans sent their daughter to private school because they found the public schools unacceptable due to the threat of corporal punishment. Dallas also testified that their daughter had asthma and required medical treatment. This accounted for the $140 in medical fees listed on the chart. He testified that, although their health insurance was paid by his employer, the family incurred various expenses related to their daughter's asthma

condition because of their high deductible. The Cheesmans owned a 1988 Chevrolet Nova worth approximately $3,000. They made monthly payments of $350 on the car. There was $7,081 due on the car.

At the conclusion of the hearing, the court stated that "this [case] is probably as problematic a case as the [c]ourt has had". It found that the Cheesmans "are in a downward spiral and will continue to go deeper in debt". As a result, the court held that the student loans imposed an undue hardship on the Cheesmans. In view of the Cheesmans' potential for employment and financial improvement, however, the court placed the case on its docket to be called up for review in eighteen months. The court stated that it would determine whether discharge was still appropriate at that time. On April 21, 1992, the court entered a written order implementing its oral order.

TSAC appealed to the district court. On January 12, 1993, the district court affirmed the bankruptcy court's order. The district court construed the bankruptcy court's order as a stay of its decision that the loans were dischargeable. The court held that § 105(a) authorized the bankruptcy court to impose the eighteen-month stay. The court also affirmed the bankruptcy court's holding that exception from discharge would impose an undue hardship on the Cheesmans. This appeal followed.

## II.

### (A) UNDUE HARDSHIP

■ TSAC contends that Dallas and Margaret Cheesman's student loans were not dischargeable pursuant to § 523(a)(8)(B). They assert that the loans did not impose an undue hardship. This is a question of law subject to *de novo* review. *In re Roberson*, 999 F.2d 1132, 1134 (7 Cir.1993).

■ Section 523(a)(8)(B) provides that an educational loan is not to be discharged unless "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents". Congress designed this provision "to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a

discharge of their educational loans". *Andrews University v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6 Cir.1992); *In re Pelkowski*, 990 F.2d 737, 742 (3 Cir.1993) (section 523 resulted from the concern about "the perceived rise in bankruptcy filings by students on the brink of lucrative careers").

Courts have used a number of tests in determining what constitutes an undue hardship. One test requires the debtor to demonstrate "(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period ...; and (3) that the debtor has made good faith efforts to repay the loans". *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2 Cir.1987) (per curiam); *In re Roberson, supra*, 999 F.2d at 1135 (adopting the *Brunner* test).

Other tests have focused on "'whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living'". *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8 Cir.1981) (citing *In re Wegfehrt*, 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981)).

■ In its decision, the bankruptcy court did not state which test it used to determine that the Cheesmans' loans imposed an undue hardship. We believe, however, that the loans were dischargeable under any undue hardship test the court may have used in reaching its decision.

First, there was no indication that the Cheesmans were capable of paying the loans while maintaining a minimal standard of living. The Cheesmans' 1992 gross income of $15,676 exceeded by only a slim margin the government's 1992 poverty income guideline of $13,950 for a family of four. The expense chart presented by the Cheesmans demonstrated that they maintained a frugal lifestyle consistent with their low income. Despite

this fact, the Cheesmans had a monthly deficit of approximately $400. Under these circumstances, we are satisfied that the Cheesmans could not maintain a minimal standard of living for their family if they were required to repay their loans.

Furthermore, there is no indication that the Cheesmans' financial situation will improve in the foreseeable future. True, Dallas testified that he was hoping for a promotion at his current job, and Margaret testified that she was actively seeking employment. There is no assurance, however, that either will obtain their objectives. Moreover, Margaret's employment history does not indicate that the Cheesmans' financial condition would improve considerably if she obtained a position as a teacher's aide. At best, she worked only intermittently as a teacher's aide. She received only minimal wages before her position was eliminated. Also, the court properly considered the fact that Margaret's unemployment compensation would run out within two weeks of the hearing and that this would burden further the Cheesmans' financial situation.

There is no evidence that the Cheesmans did not act in good faith. This is not a case where the petitioner seeks discharge within a month of loans becoming due. *Brunner, supra,* 831 F.2d at 397. The Cheesmans made minimal payments on their loans several years after their loans became due and at least a year before filing for bankruptcy. Furthermore, the Cheesmans chose to work in worthwhile, albeit low-paying, professions. There is no indication that they were attempting to abuse the student loan system by having their loans forgiven before embarking on lucrative careers in the private sector. In light of these considerations, we hold that the Cheesmans' student loans imposed an undue hardship.

We agree with the bankruptcy court's holding that the Cheesmans' student loans were dischargeable pursuant to § 523(a)(8)(B).

(B) BANKRUPTCY COURT'S AUTHORITY TO STAY ITS DISCHARGE ORDER

TSAC contends that the bankruptcy court erred in failing to make a final determination of whether the loans were dischargeable. It asserts that the court did not have the equitable authority to postpone making a final determination of dischargeability. We disagree.

■ In deciding to revisit the dischargeability issue in eighteen months, the bankruptcy court did not state upon what ground it was authorized to delay making a final decision. Its order merely states that it "will review the plaintiffs' financial position in eighteen months to determine whether the undue hardship remains". We believe that the district court properly construed this order as a stay authorized by 11 U.S.C. § 105(a).

Section 105(a) provides that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title". Several courts have suggested that the bankruptcy courts have broad equitable powers to protect debtors pursuant to § 105(a). *River Hills Assocs., Ltd. v. River Hills Apartments Fund (In re River Hills Apartments Fund),* 813 F.2d 702, 707 (5 Cir.1987) (court may enjoin action against debtor's property upon expiration of 11 U.S.C. § 362 automatic stay); *Courtney v. Gainer Bank (In re Courtney),* 79 B.R. 1004, 1013 (Bankr.N.D. Ind.1987) (section 105(a) authorizes the court to extend the automatic stay imposed by § 362 to provide the debtor with "breathing room" upon a determination that student loans were nondischargeable). The cases cited by TSAC require only that the bankruptcy court exercise its § 105(a) discretion within the confines of the Bankruptcy Code. E.g., *Wasserman v. Immormino (In re Granger Garage, Inc.),* 921 F.2d 74, 77 (6 Cir.1990) (bankruptcy court may not extend its subject matter jurisdiction under the guise of its equitable powers).

We believe that the bankruptcy court exercised its equitable power pursuant to § 105(a) in a manner consistent with the Bankruptcy Code. The court stated that this was as difficult a case as it had had to decide. Although the court decided that discharge was appropriate at the present time, it

stayed its order on the ground that the Cheesmans' financial situation might improve in the near future, thereby making discharge unwarranted. In so doing, the court appropriately attempted to balance the Bankruptcy Code's goal of providing a fresh start to the Cheesmans with Congress's goal of preventing abuse of the student loan program. We are satisfied that, on the facts of this case, the court acted within its § 105(a) discretion in granting an eighteen-month stay.

We agree with the bankruptcy court's stay of its discharge order.

### III.

To summarize:

The bankruptcy court properly held that the Cheesmans' student loans were dischargeable pursuant to § 523(a)(8)(B) because the loans imposed an undue hardship. The court properly stayed its discharge order pursuant to the court's § 105(a) equitable authority.

Affirmed.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

The court concludes that the Cheesmans' student loans are dischargeable pursuant to § 523(a)(8)(B) because requiring the Cheesmans to repay them would impose an undue hardship. The court then goes on to conclude that the bankruptcy court had the authority pursuant to § 105(a) to stay its discharge order. Since I disagree with both of these conclusions, I respectfully dissent.

While § 105(a) grants bankruptcy courts broad equitable powers, I do not believe this includes the power to effectively postpone a decision as to the dischargeability of a student loan. Neither a single case nor any authority that stands for such a proposition has been brought to the court's attention. The one case seemingly on point, which is quoted by the Cheesmans and cited by the court, *In re Courtney,* 79 B.R. 1004 (Bankr. N.D.Ind.1987), is distinguishable. The court in *Courtney,* referring to its broad powers under § 105(a), held:

[A]lthough [this court] cannot modify the terms and conditions of any educational

loan found to be nondischargeable, it may, in the judgment, order that the automatic stay which would otherwise be vacated remain in effect for a period of time to give the Debtor additional "breathing room", post-discharge, based on the prospects that he will have sufficient net income in the reasonably foreseeable future to repay an educational loan, although he may not have such net income at the time of the judgment.

*Id.* at 1013. At the very most, this passage indicates a court, *after* finding a debt to be not dischargeable, may use its equitable powers to give the debtor additional "breathing room" before making repayments. I do not dispute this proposition, and note that other courts have reached a similar conclusion. *See, e.g., In re Conner,* 89 B.R. 744 (Bankr. N.D.Ill.1988) (finding the debt was not dischargeable, but ordering a deferment in the collection of the debt to allow the debtor time to reorganize financially). Postponing the repayment of a nondischargeable debt, however, is not the same as postponing the initial determination of whether the debt is dischargeable.

As the case currently stands, neither party benefits. If the court had ruled the debts were not dischargeable, TSAC could have taken actions to collect these loans and the Cheesmans would have known exactly where they stood. On the other hand, if the court had ruled the debts were dischargeable, then TSAC would have been entitled to reimbursement from the United States Department of Education, *see* 34 C.F.R. § 682.402(d) & (h) (1992), and the Cheesmans would have known that they were forever free from the burden of repayment. Here, however, as the case waits "in limbo," TSAC is foreclosed from taking any action, and the Cheesmans are left with the uncertainty of whether they ultimately will be responsible for having to pay these debts. Moreover, if a court can revisit a finding of undue hardship 18 months later, then does it not follow that, because a debtor's financial position could worsen, a court may also revisit a finding of nondischargeability at a later date?

I also disagree with the court's finding that requiring the Cheesmans to repay their loans would impose an undue hardship. The court bases this holding on the presence of three factors: (1) the Cheesmans could not maintain a minimal standard of living if they were required to repay their loans; (2) there is no indication that the Cheesmans' financial situation will improve in the foreseeable future; and (3) there is no evidence that the Cheesmans did not act in good faith. Section 523(a)(8)(B) creates a presumption that student loans are nondischargeable in bankruptcy, and the burden of challenging that presumption falls on the debtor. *See, e.g., United States v. Wood,* 925 F.2d 1580, 1583 (7th Cir.1991). In my view, the Cheesmans failed to carry their burden in establishing the existence of the second and third factors.

The second factor requires a debtor to show "by a fair preponderance of the evidence, that additional circumstances exist indicating that the described state of affairs is likely to persist for a significant portion of the repayment period...." *In re Healey,* 161 B.R. 389, 395–96 (E.D.Mich.1993). "[T]he dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Matter of Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993) (citation omitted). While predicting future income is difficult, as evidenced by the bankruptcy court's order to reexamine this issue 18 months later, the Cheesmans had the burden to establish "additional circumstances" that indicated a likelihood that their current inability to simultaneously repay the loans and maintain a minimal standard of living would extend for a significant portion of the loan repayment period. *Healey,* 161 B.R. at 396. The Cheesmans have not met this burden.

The Cheesmans are not disabled. They are not ill. They are not elderly. They are both college trained. At the time of the bankruptcy hearing, Mr. Cheesman held a job, and he testified that there was the possibility of a promotion with his current employer. Mrs. Cheesman is qualified to tutor or substitute teach, as she did prior to the filing of the Chapter 7 petition. These circumstances are inapposite of those in cases in which a court has found "additional circumstances" to exist. *See, e.g., Matter of Diaz,* 5 B.R. 253 (Bankr.W.D.N.Y.1980) (student loan was dischargeable when debtor could only work half a day because of physical problems, was impoverished, partially deaf, cardiac, divorced from her institutionalized husband, and had several children, some of whom required psychiatric and dental care); *In re Bagley,* 4 B.R. 248 (Bankr.D.Ariz.1980) (unemployed debtor subsisting at near welfare level, burdened with medical bills of a child with chronic respiratory illness whose condition required the care of the debtor and impeded her gainful employment, did not have any reasonable prospects of acquiring more wealth); *cf. In re Webb,* 132 B.R. 199, 201 (Bankr.M.D.Fla.1991) (no additional circumstances existed to indicate a likelihood that current inability to find any work would extend for significant period of time when debtor was not disabled or elderly, and was "educated, experienced, and articulate"). The record does not support a finding that the Cheesmans have demonstrated their current adverse financial condition will persist for a significant time.

Moreover, I do not believe the Cheesmans proved they acted in good faith. As discussed in the court's holding, one element considered in evaluating a debtor's good faith is the effort the debtor has made to repay his or her loans. Here, during the six-year period after the loans first became due and payable, the Cheesmans made only two $50 payments on each of their loans. There also is no evidence that the Cheesmans sought the less drastic remedy of a deferment of payments on their debts before attempting to discharge them. *See Brunner v. New York State Higher Educ. Servs. Corp.,* 831 F.2d 395, 397 (2nd Cir.1987) (finding that debtor lacked good faith in attempting to discharge debt where she failed to seek a deferment of her loan); *Healey,* 161 B.R. at 397 (finding debtor's attempt to discharge debt without first seeking to negotiate a payment arrangement with the lender evidenced bad faith).

"Undue hardship" is not defined in the Bankruptcy Code. The term "undue hardship," however, indicates that the type of

hardship involved in a particular circumstance must be significant. *See In re Phillips,* 161 B.R. 945 (Bankr.N.D.Ohio 1993). I do not believe the Cheesmans have carried their burden in demonstrating that circumstances will prevent their financial condition from improving in the future or that they have acted in good faith; thus, I would find the undue hardship requirements have not been met. I would therefore vacate the bankruptcy court's decision and remand with the instruction that the Cheesmans' student loans be declared non-dischargeable.