Natalie R. QUEEN

v.

**PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY**

Natalie R. QUEEN

v.

**ILLINOIS STUDENT ASSISTANCE COMMISSION**

Civil Action No. 96–6033.
Civil Action No. 96–6768.

United States District Court,
E.D. Pennsylvania.

July 15, 1997.

Rosetta B. Packer, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Natalie R. Queen.

Natalie R. Queen, Philadelphia, PA, Pro se.

K. Kevin Murphy, Harrisburg, PA, for Pennsylvania Higher Educ. Assistance Agency.

David J. Hershman, Chicago, IL, for Assistance Com'n Creditor and Illinois Student Assistance Com'n.

James W. Flood, Norristown, PA, for Terry Y. Mayer.

Clancy McKenzie, Dr., Bala Cynwyd, PA, Pro se.

Virginia R. Powel, Philadelphia, PA, Pro se.

Christine C. Shubert, Tabernacle, NJ, trustee.

Frederic Baker, Assistant U.S. Trustee, Philadelphia, PA, trustee.

Edward L. Berger, Philadelphia, PA, for Illinois Student Assistance Com'n.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

The Pennsylvania Higher Education Assistance Agency ("PHEAA") and the Illinois Student Assistance Commission ("ISAC") appeal from the Bankruptcy Court's decision below[1] declaring debtor Natalie R. Queen's ("Queen") student loan obligations to these two institutions to be dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B).[2] The specific issue presented to the court is whether the Bankruptcy Court committed reversible error by failing to properly apply the three-part test established in *In re Faish,* 72 F.3d 298 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996), when it declared Queen's student loan obligations dischargeable on the basis of undue hardship pursuant to 11 U.S.C. § 523(a)(8)(B). For the reasons that follow, the Bankruptcy Court's decision will be affirmed.

## I. BACKGROUND

The Bankruptcy Court made the following findings of fact. At the time of her trial, Queen was a 28–year–old single mother of a 20–month–old. She is the sole support for her child. Queen lives with her mother in public housing in Connecticut, where she and her daughter sleep in the living room. She receives $513 per month in welfare benefits and approximately $100 per week as a part-time sales clerk. Her total income is $977 per month. Queen's expenses total $920 per month, which includes Queen's contribution

---

**1.** The bankruptcy decision below is captioned *In re Mayer,* 198 B.R. 116 (Bankr.E.D.Pa.1996). There, the bankruptcy court rendered a decision with respect to two debtors—Terry Y. Mayer and Natalie R. Queen. The instant decision is with respect to Queen's case only.

**2.** Section 523(a)(8)(B) provides that a Chapter 7 discharge will not discharge a debtor from any debt:

for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—... excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents....

to the payment of her mother's rent and utility bills.

Queen obtained her undergraduate loans, totalling in excess of $11,700, in order to attend St. Augustine's College in Raleigh, N.C., where she graduated with a bachelor's degree in 1989. Thereafter, she was only able to obtain employment as a non-salaried commissioned sales representative in her home state of Connecticut. She then moved back to Raleigh where she was only able to obtain part-time employment with United Parcel Service.

In January 1992, Queen moved to Philadelphia to begin a master's degree program at Temple University. During that time she amassed loans in excess of $9,000. She did not complete the master's degree program.

By October 1992, Queen obtained work as a full-time non-tenured employee at the United States Post Office where she earned between $6.50 and $7.00 hourly. In September 1994, Queen took maternity leave. Her return to employment was denied due to an alleged misunderstanding concerning her leave request. Subsequently, Queen separated from her child's father, who pays no child support, and began receiving public assistance.

Queen's student loan payments were deferred until July 1993. She thereafter made two payments of $92.24. Queen is pessimistic about her ability to engage in full-time employment because any salary earned would be offset by day care costs, which she had priced at between $250 and $1,000 per month.[3]

On December 22, 1995, Queen filed for Chapter 7 bankruptcy. On April 9, 1996, Queen commenced two adversary proceedings, one against PHEAA[4] and the other against ISAC, seeking a ruling that her student loans from these two institutions were dischargeable. On July 9, 1996, the bankruptcy court heard both matters in a consolidated trial at which Queen was the only witness. On July 19, 1996, the bankruptcy court issued a decision in favor of Queen. Both PHEAA and ISAC appeal from this decision. This court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 158(a).[5]

## II. DISCUSSION

### A. *Standard of Review*

In reviewing a case on appeal, the bankruptcy court's findings of fact shall not be set aside unless clearly erroneous. *See Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.,* 57 F.3d 1215, 1223 (3d Cir. 1995). However, review of the bankruptcy court's legal determinations is plenary. *Id.* Where the bankruptcy court's determinations involve mixed questions of law and fact, the standard of review is also mixed. *See Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641–42 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). In such a situation, a reviewing court must "accept the [bankruptcy] court's findings of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.' " *Id.* at 642 (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)). Because appellants PHEAA and ISAC contend that the Bankruptcy Court below misapplied the Third Circuit's three-part *Faish* test to the facts it found, and therefore erroneously concluded that Queen's student loan debt was

---

**3.** Queen testified at trial that she found the price of day care to start at $250 per week, which amounted to $1,000 per month or $12,000 per year. (Tr. at 22.) However, the Bankruptcy Court's opinion stated that Queen priced day care costs "between $250 and $1,000 per month." *Mayer,* 198 B.R. at 119.

**4.** The action against PHEAA also included as a defendant Richard Riley, Secretary, United States Department of Education. According to the bankruptcy court, the Department of Edu-

cation answered that it neither held nor owned Queen's student loan notes and requested that no relief be granted against it.

**5.** 28 U.S.C. § 158(a) states, in pertinent part:

The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

dischargeable, this court exercises plenary review.

## B. *The Bankruptcy Court's Application of the Faish Test*

■ In *Faish* the Third Circuit clarified the analysis that a court must employ when determining whether a debtor's student loans are dischargeable under the "undue hardship" exception of § 523(a)(8)(B). In order for a debtor's student loans to be dischargeable for undue hardship, a court must conclude:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Faish*, 72 F.3d at 304–05 (quoting *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987)). The Bankruptcy Court below concluded that Queen satisfied all three requirements and, therefore, her student loan debt was dischargeable under the undue hardship exception of § 523(a)(8)(B).

Appellants argue that the Bankruptcy Court's statement at trial that the *Faish* test is a looser standard than the standard set forth in *In re Bryant*, 72 B.R. 913 (Bankr. E.D.Pa.1987), and that under the *Bryant* test Queen's student loan debt would be nondischargeable, shows that the Bankruptcy court misinterpreted the *Faish* test. While the Bankruptcy Court's characterization of the *Faish* test at trial might not have been entirely accurate, the court finds that the Bankruptcy Court's ruling is nonetheless justified by the facts of Queen's case.

The *Bryant* court explained its proposed test for undue hardship which the *Faish* court later overruled, in the following manner:

The test which we propose strives to place the element of objectivity into the process of decision-making in this area. We propose, as a starting position, to analyze the income and resources of the debtor and his dependents in relation to federal poverty guidelines established by the United States Bureau of the Census and determine the dischargeability of the student loan obligation on the basis of whether the debtor's income is substantially over the amounts set forth in those guidelines or not. If not, a discharge will result only if the debtor can establish "unique" and "extraordinary" circumstances which should nevertheless render the debt dischargeable. If the debtor's income is below or close to the guideline, the lender can prevail only by establishing that circumstances exist which render these guidelines unrealistic, such as the debtor's failure to maximize his resources or clear prospects of the debtor for future income increases. We feel that such a test will decrease, if not eliminate the resort to the unbridled subjectivity which seems to pervade many of the decisions in this area.

*Bryant*, 72 B.R. at 915.

The *Faish* court rejected the *Bryant* test for undue hardship primarily for two reasons. First, the *Faish* court considered the *Bryant* test's "refusal (or at least extreme reluctance) to question whether certain expenses debtors have incurred can be justified" to be inconsistent with Congress' dual legislative goals of "eliminat[ing] debtor abuse of the educational loan program" and "preserv[ing] the fiscal integrity of the student loan program." *Faish*, 72 F.3d at 304. The court explained:

The *Bryant* test does not adequately account for the fact that one of the most common reasons student-loan debtors find themselves in bankruptcy court is that their "subjective value judgments" are often (but not always) indicative of a spendthrift philosophy which a bankruptcy court should be competent to consider before discharging their student loans.

*Id.* Second, the *Faish* court considered the question of whether "the dominant purpose of the bankruptcy petition was to discharge the student debt" a relevant inquiry, which the *Bryant* test had rejected. The *Faish* court reasoned:

The purpose behind the debtor's bankruptcy petition is not irrelevant in this context because one of the reasons that Congress enacted § 523(a)(8)(B) was in response to "reports of students discharging student loan debts after graduation and subsequently accepting high-paying jobs."

*Faish*, 72 F.3d at 304 (quoting Kurt Wiese, Note, *Discharging Student Loans in Bankruptcy: The Bankruptcy Court Tests of "Undue Hardship"*, 26 Ariz. L.Rev. 445, 446 (1984)). Hence, the *Faish* court rejected the *Bryant* test and adopted the test established by the United States Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987), which incorporated the considerations the *Faish* court deemed necessary under an undue hardship analysis.

The fact that the Third Circuit's criticisms of the *Bryant* test focused on the *Bryant* test's failure to scrutinize both the debtor's claimed expenses and his or her motives behind filing for bankruptcy shows that the Third Circuit was concerned that debtors who fell close to or below the federal poverty guidelines but who could still afford to repay their loans, albeit with "some major personal and financial sacrifices," should not be freed from their student loan obligations. *Faish*, 72 F.3d at 305–06. Hence, the Third Circuit did not view the *Brunner* test as a more liberal approach to determining "undue hardship" than the *Bryant* test. Rather it considered the *Brunner* test as avoiding "the unwarranted deference with which the *Bryant* test reviews the personal spending habits of student-loan debtors." *Faish*, 72 F.3d at 306. In that respect, the *Brunner* test is a more stringent one than *Bryant*'s.

■ Nonetheless, the findings made by the Bankruptcy Court do support its conclusion that Queen's student loan debt is dischargeable for undue hardship. With respect to the first requirement that Queen not be able to maintain, based on her current income and expenses, a "minimal" standard of living for herself and her daughter if forced to repay the loans, the Bankruptcy court concluded that Queen's living standard is "sub-minimal" and that "[a]ny added expenses would simply be intolerable to impose on her at present." *In re Mayer*, 198 B.R. 116, 126 (Bankr.E.D.Pa.1996). The court reasoned:

It is true that Queen's income, though largely consisting of public assistance, slightly exceeds both the applicable poverty guidelines ... and her reported expenses. However, this is because she has minimized her expenses by reducing the standard of her living conditions to those which can only be described as sub-poverty level. She left her own dwelling in Philadelphia, and moved back home, with her baby, to live in a crowded public housing unit with her mother and her family. In so doing, Queen has demonstrated her recognition of a need to drastically economize her expenditures, far beyond that which most persons, indeed most debtors, would be willing to endure. She could probably live more cheaply only if she chose to become a homeless person.

*Id.* (citation omitted).

To elaborate, in the five years following her graduation from college, Queen was not able to secure employment at salary higher than approximately $17,000 per year, what she earned at the U.S. Post Office. (Tr. at 31; Appellee Br. at 11.) In order to minimize her expenses, Queen moved into her mother's public housing unit, for which Queen contributes $175 per month. (Tr. at 28.) This reduction in the cost of housing enables Queen to pay for other necessities such as food, clothing, transportation, and utilities. Of these expenses, one category that causes the court hesitation is the $175 per month or $2100 per year allocation for clothing, even considering the fact that Queen's growing child may need new clothes at a relatively frequent rate. Similarly, Queen's pricing of day care at $1,000 per month minimum, appears rather generous, which the Bankruptcy Court itself noted. *See Mayer*, 198 B.R. at 127. However, looking at the totality of Queen's expenses, she does not have the spendthrift philosophy that would militate against a determination of undue hardship. *Faish*, 72 F.3d at 304. Moreover, there is no indication from Queen's employment history that she is able to secure a job at a salary high enough to cover her

child care expenses, costs of other necessities, and enable her to make her student loan payments. Thus, her present situation does not appear to be self-imposed. Therefore, the court finds that the Bankruptcy Court's determination that Queen would not be able to maintain, based on her current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans is supported by the facts of Queen's case and for this reason affirms the Bankruptcy Court's reasoning under the first requirement of the *Faish* test.

As for the second requirement that additional circumstances exist indicating that Queen's state of affairs is likely to persist for a significant portion of the repayment period for her student loans, the Bankruptcy Court explained:

> It is true that, in the ordinary course, Queen's daughter would be in first grade in five years. However, it is unclear to us that care of a child of that age, particularly during summer and other vacations, would not need her mother's constant care. Moreover, the daughter has been fitted with a leg brace, which may reflect a disability. Of course, anything could happen in the next five years. Queen is a healthy young woman capable of bearing more children. On the other hand, she may unexpectedly obtain a high-paying job, win the state lottery, or meet and marry a professional basketball player.

*Mayer*, 198 B.R. at 127. The Bankruptcy Court also observed that "even before Queen became pregnant with her daughter, she had never attained secure or lucrative employment" and that "the best job that Queen ever obtained was as a 'casual' USPO employee in Philadelphia earning, at most, $7.00/hr." *Mayer*, 198 B.R. at 127. Using this rate of pay as a point of reference, the Bankruptcy Court calculated that Queen's child care costs, even adjusting for Queen's possible over-estimate of $1,000 per month of such costs, "would leave Queen with income which is still close to the poverty line for a family of two." *Id.* Further, the Bankruptcy Court distinguished Queen's situation to those debtors in *Brunner* and *In re Roberson*, 999 F.2d 1132 (7th Cir.1993), who were not able to satisfy the second requirement of the *Brun-*

*ner/Faish* test, by emphasizing that the debtors in *Brunner* and *Roberson* did not have dependents. *Id.* The Bankruptcy Court compared Queen's situation to the debtors' in *In re Cheesman*, 25 F.3d 356 (6th Cir.1994), cert. denied, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995), whose student loan debts were discharged, and concluded that Queen's prospects for increased income "seem nowhere as near as likely or imminent." *Id.* Thus, based on the fact that Queen had a dependent of a very young age whose cost of care would be relatively substantial compared to Queen's historical earning capacity, the court concluded that Queen's state of affairs was likely to persist for a significant portion of the repayment period for her student loans. *See id.* The court views this reasoning as sound and therefore affirms the Bankruptcy Court's reasoning under the second requirement of the *Faish* test.

In evaluating the *Faish* test's third requirement that Queen have made good faith efforts to repay her loans, the Bankruptcy Court noted that the good faith requirement "measures not simply whether or not a debtor has paid towards a student loan debt in the past, but emphasizes whether or not that debtor has maximized financial resources in order to prevent a default and has allowed sufficient time before declaring bankruptcy to obtain the job sought when the education in issue was being obtained." *Mayer*, 198 B.R. at 127–28. The Bankruptcy Court considered the facts that Queen incurred her initial, larger student loans over seven years prior to filing the instant two adversary proceedings, attempted to better herself by re-entering school in 1992, and waited another three years after leaving graduate school before filing for bankruptcy to be indicative of Queen's good faith. *Id.* at 128. This court agrees and therefore affirms the Bankruptcy Court's reasoning under the third requirement of the *Faish* test.

## III. CONCLUSION

For the reasons stated above, the court will affirm the Bankruptcy Court's decision below.