In re William Frederick HAFNER, II, Debtor.

William Frederick Hafner, II, Plaintiff,

v.

Sallie Mae Servicing Corporation, et al., Defendants.

Bankruptcy No. 01–58300.
Adversary No. 01–2382.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Dec. 24, 2003.

Todd G. Finneran, Columbus, OH, Former Attorney for the Plaintiff.

Matthew J. Thompson, Nobile, Needleman & Thompson LLC, Columbus, OH, for Defendant.

Alexander G. Barkan, Columbus, OH, Assistant U.S. Trustee.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

William Frederick Hafner, II ("Plaintiff") seeks a discharge of student loans based upon the "undue hardship" provision of section 523(a)(8) of the United States Bankruptcy Code. ("Code"). The remaining loans are owed to the assignee, Educational Credit Management Corporation ("Defendant"). The current balance is approximately $78,215.02. The Court concludes that the Plaintiff has established entitlement to a partial discharge. A summary of the facts will illustrate the bases for this decision.

The Plaintiff is a 57–year–old, unmarried man with no dependants. In 1970, he earned a Bachelor's Degree in History from The Ohio State University. Then in 1971 the Plaintiff received a Master's Degree in History from the University of

Illinois, and in 1974 he obtained a Master's Degree in Library Science from Case Western Reserve University. Upon completing his studies at Case Western, the Plaintiff became a librarian at the University of Missouri—Kansas City.

After the University of Missouri terminated the Plaintiff, he was hired as a humanities liaison librarian at Florida Atlantic University, where he worked from 1977 to 1981. In this position, the Plaintiff's duties included teaching classes, providing reference service and selecting books. From 1981 to 1983, the Plaintiff worked as an acquisition librarian at Lake Superior State University in Michigan. In 1983, he was hired as the acquisition librarian at the University of West Florida. The Plaintiff, however, returned to Lake Superior State University in 1984 and provided library instruction. The Plaintiff held this position until 1989, when Lake Superior State declined to award tenure. He ended his career there as a cataloguer.

Next, the Plaintiff was hired as the coordinator of the collection development at Western Carolina University. His duties included managing a staff of two. Western Carolina University declined to reappoint the Plaintiff in 1992. The Plaintiff then obtained two part-time jobs, one as a security guard at Western Carolina University and the other as a grill cook at Wendy's. He held these positions until about August 1995.

In 1995, at the age of 49, the Plaintiff was admitted to the Capital University School of Law. The Plaintiff financed his legal education with approximately $86,494.00 in student loans and funds from a retirement account. The Defendant guaranteed $55,500.00 of the Plaintiff's student loans, and the remaining $30,996.00 was guaranteed by HEMAR Insurance Corporation of America ("HEMAR"). The Plaintiff graduated in 1998, and ranked 101st out of a class of 212. The Plaintiff testified that he planned to become a bankruptcy attorney.

The Plaintiff applied to take the July 1998 Ohio bar examination. According to the Plaintiff, the bar application was withdrawn after being informed that he needed open-heart surgery to repair a leak in the mitral valve. Testimony received from the Plaintiff's clinical psychologist, however, suggests that the heart surgery was a procedure that could have been postponed, but the Plaintiff elected to undergo the procedure instead of taking the exam.

In an effort to defray expenses, the Plaintiff testified that in 1998, he withdrew approximately $20,575.00 from his CREF retirement accounts. In November 1998, the Plaintiff's student loans were placed into forbearance. He then applied to take the February 1999 Ohio bar exam, but withdrew the application one week prior to the test, due to poor performance on the practice exams. In February 1999, the Plaintiff moved to Coshocton, Ohio to live with his parents.

The Plaintiff testified that in 1999, he paid expenses with credit cards and $5,000.00 withdrawn from the CREF accounts. The next year, the Plaintiff withdrew approximately $28,833.27 from the CREF accounts. Those funds were used to pay for an apartment the Plaintiff maintained in Columbus, Ohio, for living expenses and toward the student loans. Between June 2000 and February 2001, the Plaintiff paid approximately $6,638.21 on the student loans.

After exhausting the CREF accounts, the Plaintiff ceased making payments on the student loans. The Plaintiff, however, failed to apply for consolidation of the loans. He also did not apply for forgiveness due to permanent disability. In 2001, the Plaintiff interviewed for a produce

stocking position with Wal–Mart. The Plaintiff also attended a truck driving school for four weeks in 2001. He was, however, unable to pass the commercial driver's license test. The Plaintiff has not been employed full-time since 1995.

On July 16, 2001, the Plaintiff filed bankruptcy under chapter 7 of the Code. At the time of filing, he had approximately $207,759.00 in general unsecured debt that included $120,635.00 in student loans, $86,776.00 in credit card debt and $348.00 for rent. At the time of filing, the Plaintiff had no income, and his monthly expenses totaled $350.00, primarily comprised of medical and transportation expenditures. To discharge his student loans, the Plaintiff filed this adversary proceeding on November 13, 2001.

Approximately three months later in February 2002, the Plaintiff's father died leaving him a stock portfolio worth approximately $111,469.94. The Plaintiff testified that to date, he has withdrawn approximately $28,750.00 from the inheritance to pay for living expenses and the following goods and services: $11,200.00 for the purchase of a 1998 Honda Accord; $1,050.00 for a psychiatric evaluation, and $3,000.00 for medical testing related to his prostate. Most notably, the Plaintiff used $13,500.00 of those funds to pay HEMAR as a settlement on the student loans it guaranteed.

The Plaintiff's current assets and income include approximately $90,826.50 in the stock portfolio, $219.37 received each month in interest and dividends from the stock portfolio, approximately $52,068.00 held in a TIAA account, and $100.00 received each month from his elderly mother. In October 2005 the Plaintiff will be eligible to withdraw approximately $594.41 per month from the TIAA account.

In addition to these resources, in 2008, at the age of 62, the Plaintiff will be eligible to receive social security in the approximate amount of $744.00 per month. According to the Plaintiff's projections, in 2008, his monthly income will include $744.00 from social security, $594.41 from the TIAA account, and $182.47 in interest and dividend payments from the stock portfolio. By the end of 2015, the Plaintiff's TIAA income would cease, leaving him with the interest and dividend payments from the stock portfolio and his social security. Finally, the Plaintiff testified that at some time in the future he will inherit approximately $175,000.00 from his 84–year–old mother, before taxes and administrative expenses are deducted.

Though the Plaintiff's petition reveals that at the time of filing bankruptcy his monthly expenses totaled only $350.00, he now indicates that his current monthly expenses average approximately $770.77. These expenses include: $561.42 for medical and dental expenses; $5.66 for mailbox rental; $29.61 for transportation; $65.03 for automobile insurance; $66.59 for clothing; $38.71 for federal, state and local income taxes, and $3.75 for charitable contributions. The Plaintiff also testified that his physicians are currently providing him with free medication worth approximately $180.00 per month.

In an effort to provide evidence concerning his future expenses, the Plaintiff projected that monthly expenses in 2008 would total approximately $1,520.16. These expenses would include: $575.00 for rent; $203.66 for utilities; $130.00 for food; $60.00 for clothing and laundry; $210.00 for medical expenses; $175.00 for transportation; $10.00 for charitable contributions; $109.50 for insurance, and $47.00 for federal, state and local income taxes.

The Plaintiff testified that he currently suffers from high blood pressure, and a hernia. He also testified that he may re-

quire surgery for an enlarged prostate. According to the Plaintiff, the surgery would cost approximately $16,000.00. A letter submitted from Jack Parren of Agents Brokerage Parren Associates, indicated that based upon the Plaintiff's age and condition, health insurance would cost approximately $744.03 per month.

The only corroborating medical evidence supplied was from Dr. Jolie S. Brams ("Dr. Brams"), a clinical psychologist, who testified and prepared a report. In performing her clinical analysis, Dr. Brams considered the Plaintiff's developmental, work-related and psychiatric history. In addition, Dr. Brams allowed the Plaintiff to take the Minnesota Multiphasic Personality Inventory 2 exam ("MMPI–2"). According to Dr. Brams, the Plaintiff suffers from Asperger's syndrome, a variant on the autistic continuum that was added to the Diagnostic and Statistical Manual in 1993. Dr. Brams testified that the lower end of the autistic continuum includes people who are mentally retarded, compared to those who suffer from Asperger's syndrome. These individuals function at a higher level. According to Dr. Brams, Asperger's syndrome is a neurological disorder that is not treatable.

In the Report Dr. Brams indicates that individuals with Asperger's syndrome have significant interpersonal and psychological problems. These difficulties include anxiety, social avoidance, poor development of motor and writing skills, lack of interest in sexuality, anger, and other behavioral control problems. Many people with the disorder do not marry, never have sexual relationships, and are at risk for developing other psychological problems. Also in the Report it was stated that the MMPI–2 revealed that the Plaintiff suffers from anxiety and depression, has a low tolerance for frustration, and poor social skills. Though he is not violent or dangerous, Dr.

Brams concluded in the Report that the Plaintiff verbally expresses anger inappropriately. She also testified that the MMPI–2 indicated that because he is unable to see how people perceive him, the Plaintiff would find it difficult to interact appropriately in any social situation.

Dr. Brams testified that the Plaintiff also suffers from tics, clumsiness and dyspraxia, which she defined as an inability to model what others are doing in terms of motor function. According to Dr. Brams, the Plaintiff is hyper-focused, averse to physical contact, unable to function in stressful situations, prefers isolation, and has an inability to interpret body language cues. She also testified that the Plaintiff has schizoid tendencies, defined as eccentric, isolated and uncomfortable in social situations. According to Dr. Brams' Report, the Plaintiff's employment problems were related to his difficulty managing anger, his obsessive tendencies, lack of social skills, and his inability to understand the necessity of team work.

Dr. Brams testified that the Plaintiff's functioning is impaired to the point that it would preclude him from maintaining employment even at simple, low stress, repetitive jobs. Dr. Brams testified that vocational rehabilitation efforts and anger management are useful for young adults with Asperger's syndrome. She, however, thinks that rehabilitating the Plaintiff would be difficult due to his age. Dr. Brams also testified that although there is no medication to treat Asperger's syndrome, it may help him with certain symptoms.

■ The Court must begin its analysis of the evidence by recognizing the statutory goal of the "undue hardship" provision. The purpose was to remedy perceived abuses of the bankruptcy system by students immediately seeking to discharge student loans upon graduation. *Cheesman*

*v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir. 1994), *cert. denied* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). One court has noted:

> For reasons of public policy, Congress chose to exclude from the scope of a bankruptcy discharge those debts incurred by a debtor to finance a higher education. In enacting this exception to discharge, however, Congress recognized that some student-loan debtors were deserving of the fresh-start policy provided for by the Bankruptcy Code. As a result, Congress provided that a debtor could be discharged from their educational loans if it were established that excepting the obligations from discharge would impose an "undue hardship" upon the debtor and the debtor's dependents.

*Swinney v. Academic Financial Services (In re Swinney)*, 266 B.R. 800, 804 (Bankr. N.D.Oh.2001).

In examining the evidence the Court has been mindful that debtors seeking an undue hardship discharge of student loans bear the burden of proof by a preponderance. *In re Swinney*, at 804. The following elements must be established:

1. the debtor cannot maintain, based on current income and expenses, a minimal standard of living if forced to repay the loans;
2. additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and
3. the debtor has made a good faith effort to repay the debt.

*Brunner v. New York State Higher Education Services Corp. (In re Brunner)*, 831 F.2d 395, 396 (2nd Cir.1987); *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir.

1998); *Siegel v. U.S.A. Group Guarantee Services, (In re Siegel)*, 282 B.R. 629, 634 (Bankr.N.D.Ohio 2002). Courts have held that if the first factor detailed above is not met, analysis of the remaining factors would be unnecessary. *Educational Credit Management Corp. v. Buchanan (In re Buchanan)*, 276 B.R. 744, 751 (N.D.W.Va. 2002).

Medical conditions are considered in relation to the second factor of the *In re Brunner* test. The focus is whether the medical conditions are so serious that a debtor's ability to repay is impaired for the duration of the obligation. Courts have, however, required substantial credible evidence of debilitating illness. *In re Swinney* at 805. Regarding mental health conditions it has been held that, "[a]s a general rule, psychological impairment must be an impairment to work—that is to say, an impairment to do any kind of work, even work outside of the debtor's chosen field." *United Student Aid Funds, Inc. v. Paolini (In re Paolini)*, 124 F.3d 199, 1997 WL 476515, *5 (6th Cir.1997). The Court's focus should not be on the fact that a debtor has a physical or mental impairment. What matters is the effect that impairment has upon a debtor's ability to obtain and sustain adequate financial resources in the future. *In re Paolini* at *5.

Where debtors have not been awarded undue hardship discharges, courts have utilized their equitable powers to provide partial discharges, grant payment deferrals or modify payment schedules. 11 U.S.C. § 105(a); *In re Hornsby*, at 438–440; *Fraley v. U.S. Dept. of Ed. (In re Fraley)*, 247 B.R. 417, 422–423 (Bankr. N.D.Oh.2000); *Grine v. Texas Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 198–200 (Bankr.N.D.Oh.2000). The caveat, however, is that such equitable powers should only be invoked where,

"...the equities of the situation tip distinctly in favor of the debtor ... based on the simple legal maxim that one who seeks equity must also do equity...." *In re Swinney,* at 806.

■ The Court has concluded that the Plaintiff has established entitlement to a discharge of half of the balance currently owed to the Defendant for the following reasons. First, based upon the testimony of Dr. Brams and the Court's observation of the Plaintiff, it is evident that there is some significant impairment to the Plaintiff's ability to work and maintain a minimal standard of living. Second, this impairment is reflected in the unsuccessful work history of the Plaintiff. Third, added to this burden, is the Plaintiff's age, and the fact that he has not been employed on a full-time basis since 1995, and he has not taken the bar exam approximately five years after graduation from law school. All of these factors persuade the Court that the Plaintiff's current and future ability to provide a minimal standard of living is limited, and that the prospects for any improvement are not significant. The Court has also taken into consideration the fact that the Plaintiff has attempted in good faith to make payments.

On the other hand, a complete discharge would be unjust for the following reasons. First, the Plaintiff has a stock portfolio that is worth approximately $90,826.50, and that provides income of $219.37 per month. Second, he has a TIAA account with a balance of approximately $52,068.00 that will be available in 2005, and that will provide approximately $594.41 per month. Third, in 2008, the Plaintiff will be eligible to receive approximately $744.00 per month in social security benefits. Fourth, the Plaintiff will inherit form his elderly mother a gross amount of approximately $175,000.00.

Fifth, while the Plaintiff may have significant medical expenses currently and in the future, he has discharged $86,776.00 in credit card debt, and he currently resides at home with no dependants. In fact, he continues to receive financial support from his elderly mother. She has annual income of approximately $44,000.00, and the mother owns a home free and clear of liens that is valued at approximately $150,000.00. The Plaintiff's mother has a net worth of approximately $700,000.00. It would appear that in the event of any extraordinary expenses the Plaintiff could seek some assistance from his family. Under all of these circumstances, the Court concludes that payment of half of the balance would not deprive the Plaintiff of a minimal standard of living. It is important to note that the Plaintiff made settlement arrangements with HEMAR that included payment of a significant portion ($13,500.00).

Accordingly, the Court has concluded that the Plaintiff has established entitlement to a discharge of half of the balance currently owed to the Defendant.

IT IS SO ORDERED.